UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

W.A. and M.S., *individually and on behalf of W.E.*,

Plaintiffs,

-v-

HENDRICK HUDSON CENTRAL SCHOOL
DISTRICT,

Defendant.

Case Nos. 14-CV-3067, 14-CV-4285
(KMK)

OPINION & ORDER

Appearances:

Erica Marie Fitzgerald, Esq.
Littman Krooks LLP
White Plains, NY
*Counsel for Plaintiffs*

William A. Walsh, Esq.
Weitz & Luxenberg
New York, NY
*Counsel for Plaintiffs*

Daniel Petigrow, Esq.
David Hannum Strong, Esq.
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiffs W.A. and M.S. (collectively, "Plaintiffs" or the "Parents") bring this action

individually and on behalf of their son W.E. pursuant to the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., seeking to set aside two decisions of the New

York State Review Officer ("SRO") which found that the Hendrick Hudson Central School

District ("Defendant" or the "District") did not violate its "child-find" obligations under the

IDEA and that it need not reimburse Plaintiffs for their unilateral placement of W.E. at the

Northwood School ("Northwood" or the "School") for the 2011–12 and 2012–13 school years.

The Parties cross-move for summary judgment; Defendant moves to amend its Answer to add a

counterclaim to seek reimbursement of certain monies it was ordered to pay Plaintiffs in

connection with a subsequently reversed determination by one of the New York State Impartial

Hearing Officers ("IHO") who considered certain of the claims in this case; and Plaintiffs in their

notice of motion request an order that Defendant pay them the sums requested by Defendant in

their proposed counterclaim.  For the reasons to follow, Defendant's Motion is granted in part

and denied in part, and Plaintiffs' Motion is granted in part and denied in part.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The following facts are taken from the Parties' Local Rule 56.1 Statements and the

documents contained in the record.

<u>1.  W.E.'s Experience in the District</u>

At the time of the first hearing in this case, WE. was a fifteen-year-old ninth grade

student attending a private residential school ("Northwood") in New York, although he had

attended public school in the Hendrick Hudson Central School District through eighth grade (the

2010–11 school year).  (*See* Case I Hr'g Tr. 1632; Case I Joint Ex. 54 (Aug. 30, 2011

Withdrawal Letter); *see also* Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶¶ 1–2 (Dkt. No. 34);

Pls.' Resp. to Rule 56 Statement ("Pls.' 56.1") ¶¶ 1–2 (Dkt. No. 40); Pls.' Supporting Rule 56

Statement ("Pls.' Cross 56.1") ¶¶ 503–04 (Dkt. No. 41); Def.'s Resp. to Pls.' Rule 56.1

Statement ("Def.'s Cross 56.1") ¶¶ 503–04 (Dkt. No. 42).)  W.E.'s early years in the District

were generally successful: he performed well in elementary school, participated in a number of

extracurricular programs, and began middle school engaged in academics, reading, art, music, and his friendships.  (*See* Case I Hr'g Tr. 1633–36; Case I Pls.' Ex. M (2007–08 Report Card); *see also* Pls.' Cross 56.1 ¶¶ 11–17, 24; Def.'s Cross 56.1 ¶¶ 11–17, 24.)  He began to encounter difficulties, however, in sixth grade, when he started to experience increasingly intense internal pain, which led to an emergency appendectomy.  (*See* Case II Hr'g Tr. 816–17; *see also* Pls.' Cross 56.1 ¶ 25; Def.'s Cross 56.1 ¶ 25.)  W.E.'s pain was diagnosed as abdominal migraines, and he missed at least 26 days of school.  (*See* Case I Joint Ex. 65 (6th grade attendance summary); *see also* Pls.' Cross 56.1 ¶ 25; Def.'s Cross 56.1 ¶ 25.)

The difficulties caused by W.E.'s migraines continued into the seventh grade (the 2009–10 school year), and he also began to experience more conventional migraines, leading him to miss at least as many school days as the year before.  (*See* Case I Joint Ex. 66 (7th grade attendance summary); *see also* Def.'s 56.1 ¶ 6; Pls.' 56.1 ¶ 6; Pls.' Cross 56.1 ¶ 26; Def.'s Cross 56.1 ¶ 26.)  According to M.S., by September 2009, W.E. had been begun experiencing these headaches "almost daily."  (*See* Case I Joint Ex. 1 (Apr. 23, 2010 email from M.S.); Pls.' Cross 56.1 ¶ 77; Def.'s Cross 56.1 ¶ 77.)  Although W.E.'s parents had initially thought they were related to temporomandibular joint dysfunction ("TMJ"), (*see* Case II Hr'g Tr. 817–18), abdominal migraines can evolve to become more classical migraine headaches, (*see* Case I Hr'g Tr. 889), consistent with W.E.'s experience.  According to Dr. Michael Lasser ("Dr. Lasser"), W.E.'s pediatrician, W.E.'s migraines were chronic, "[p]rofoundly severe," and, "[i]n [his] opinion[,] . . . impacted every aspect of [W.E.]."  (Case I Hr'g Tr. 1495, 1509.)  As M.S. explained, "whenever [W.E.] had a migraine, he was completely debilitated" and "couldn't really do anything."  (*Id.* at 1660–61.)

During the winter, M.S. requested a "team meeting," (*see* Case I Hr'g Tr. 1641), and, additionally, in the third quarter when W.E. missed a number of days of school, the District held an "Instructional Support Team" ("IST") meeting in the spring of 2010 to discuss W.E.'s absences and "incomplete" grades, after which W.E. was allowed to make up his missing work, have his incompletes removed, and receive grades in the A or B range, (*see* Case I Hr'g Tr. 1198–200; *see also* Def.'s 56.1 ¶ 7; Pls.' Cross 56.1 ¶ 7).  By April 2010, when his headaches were "getting worse and worse," M.S. referred W.E. to the Section 504 committee and sent a note to the guidance counselor requesting home instruction.  (Case I Hr'g Tr. 1641.)[1]  According to Brooke Bolen ("Bolen"), a counselor and Section 504 case manager at Blue Mountain Middle School, (*see id.* at 1174–75), that tutoring was approved, (*see id.* at 1202–03), rendering W.E. eligible for four hours of tutoring in May 2010, (*see* Case I Def.'s Ex. 33 (Home Instruction Tutoring Form); *see also* Def.'s 56.1 ¶ 32; Pls.' 56.1 ¶ 32).  W.E. went on to receive scores on his state assessments that demonstrated mastery or proficiency in the subjects of English Language Arts and Math.  (*See* Case I Def.'s Ex. 32 (Student Test Scores Detail); Def.'s 56.1 ¶ 13; Pls.' 56.1 ¶ 13.)

On May 25, 2010, as part of W.E.'s referral to the Section 504 committee, Dr. Richard Brodsky ("Dr. Brodsky"), the school psychologist, conducted a psycho-educational evaluation of W.E.  (*See* Case I Hr'g Tr. 464–65; 698–99; Case I Joint Ex. 4 ("Brodsky Report"); *see also* Def.'s 56.1 ¶¶ 14–16; Pls.' 56.1 ¶¶ 14–16.)  In his report, Dr. Brodsky noted that his "[c]urrent impressions [of W.E.'s conditions] include a history of TMJ and a mixed headache disorder," and described W.E. as "a soft-spoken 13-5 [sic] year old boy" who rarely smiled or engaged in

---

[1] A Section 504 committee is so named as a reference to § 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794.

casual conversation other than moments initiated by the examiner. (Brodsky Report 1–2.) As part of that evaluation, Dr. Brodsky performed the Woodcock-Johnson-III Tests of Cognitive Abilities ("WJ-III COG"), the Woodcock-Johnson-III Tests of Academic Achievement ("WJ-III ACH"), and the Behavior Assessment System for Children-Second Edition ("BASC-2"), in addition to interviewing teachers and reviewing pertinent records. (*Id.* at 1.) The WJ-III COG comprises seven subtests that measure a variety of cognitive skills, each with median scores of 100 and an average range of 80–120. (*Id.* at 2.) W.E. received a "General Intellectual Ability" standard score of 121, which equated to the 92nd percentile, placing him above the average range when compared to same-age peers. (*Id.*) The WJ-III ACH similarly involves a variety of subtests, for each of which W.E. received scores in the average to advanced range, except for math fluency, where his score fell in the "low average" range. (*See id.* at 3–4.) The BASC-2 test was completed by W.E. and two teachers. (*Id.* at 4.) The test produces "T scores" for a variety of areas, with a mean of 50 and an average range of 40 to 60, with scores outside that range being considered "At-Risk" (which "may identify a significant problem that may not be severe enough to require formal treatment or may identify the potential of developing a problem that needs careful monitoring") or "Clinically Significant" (which "suggest[s] a high level of maladjustment"). (*Id.*) W.E. received two at-risk scores in (1) "Relations to Parents," which Dr. Brodsky indicated was "reflective of the difficult communication patterns that often exist between parents and young teenagers," and (2) "Attitude Towards School," which "was marked by responses related to feeling bored with school and disliking school." (*Id.*) The clinically significant score came from just one of the teachers and was in the area of "Somatization," (*id.*), which Dr. Brodsky testified was "[p]hysical complaints, complaints of being ill," (Case I Hr'g

Tr. 716).[2]  In his report, Dr. Brodsky said that this clinically significant score "seems to [have]

be[en] directly related to moments where [W.E.] complain[ed] of not feeling well and ask[ed] to

see the nurse."  (Brodsky Report 4.)  In summary, Dr. Brodsky concluded that W.E. was a

"pleasant 13-5 year old boy in the seventh grade," who "showed above average intellectual

potential overall," with weaknesses in "fine-motor skills."  (*Id.* at 5.)  Although certain

"[d]ata . . . suggest[ed] a high level of physical complaints during academics," and "indications

of a negative attitude about school and mild oppositional behavior at home," "[n]o serious social-

emotional concerns ha[d] been reported at th[e] time."  (*Id.*)

Testifying about this test later, Dr. Brodsky indicated that "it was [his] hypothesis [that]

there may have been emotional factors at play as opposed to skill deficit."  (Case I Hr'g Tr. 708.)

Overall, Dr. Brodsky made three entries under the heading "Recommendations": (1) "All

relevant data and reports should be considered by the Section 504 Committee," (2) "[t]eachers'

input about daily functioning and behavior will be essential in determining the impact of

[W.E.]'s headaches," and (3) "[a]ttitude towards school and oppositional behavior should be

monitored for possible intervention."  (Brodsky Report 4.)  On top of these written

recommendations, Dr. Brodsky also testified that, when speaking with M.S., he "recommend[ed]

that [the Parents] consider private therapy for [W.E.]," and that his third written recommendation

was meant to be a "lead in" to a conversation in which he could recommend therapy to the

Parents.  (*See* Case I Hr'g Tr. 720–22; *see also* Case I Hr'g Tr. 752–53.)

---

[2] Dr. Daniel Williams, another doctor with whom W.E. consulted, described a
somatoform disorder as "an illness that presents primarily with physical symptoms, where after
careful evaluation by clinicians to make sure that undiagnosed physical causes have been
effectively evaluated and ruled out, there remains a component of the physical symptoms that
needs to be understood as having a psychiatric basis."  (Case I Hr'g Tr. 909.)

On June 14, 2010, the Section 504 committee met and, finding W.E. eligible for services based upon his migraine disability, developed a Section 504 accommodation plan. (*See* Case I Joint Ex. 11 (Section 504 Accommodation Plan); *see also* Def.'s 56.1 ¶¶ 9–10; Pls.' 56.1 ¶¶ 9–10; Pls.' Cross 56.1 ¶ 90; Def.'s Cross 56.1 ¶ 90.) Under that plan, W.E. was to receive accommodations consisting of extended time to complete assignments, nursing services as needed, access to class notes, and access to home tutoring. (*See* Case I Joint Ex. 11 (Section 504 Accommodation Plan); *see also* Def.'s 56.1 ¶ 11; Pls.' 56.1 ¶ 11.) According to Kathleen Coughlin ("Coughlin"), director of Pupil Personnel Services for the District, that plan did not include "school monitoring" of W.E. (*See* Case I Hr'g Tr. 389.) The extent to which Dr. Brodsky recommended counseling at the Section 504 meeting is not perfectly clear: While he may well not have formally recommended private counseling at that meeting, (*see* Case I Hr'g Tr. 1654–55 ("Q. Beyond the accommodation plans, were there any recommendations discussed [at the Section 504 Committee meeting]? . . . A. No, at that point, I was very optimistic about [W.E.]'s future[;] I thought he was doing very well. There were no other recommendations discussed.")), he did recommend it to M.S., (*see id.* at 720–21), and later suggested that he made a reference to it when speaking at least to M.S. at the meeting, (*see id.* at 752–53 ("Q. Yet you do recall specifically stating to [M.S.] in June of 2010 that you were recommending or you recommended private counseling for [W.E.]? A. Yes. Q. What context did that take place [in]? A. At the conclusion of that meeting as we discussed my recommendations, I remember sitting directly across the table from [M.S.] at that particular meeting and trying to sensitively suggest and recommend that private therapy would be a consideration.")). In any event, Dr. Brodsky testified that he recommended "private"—that is, not "school-based"—therapy because "[i]t was [his] impression that many of the[] issues that seemed to exist were based in the relationships

7

that were occurring at home with [W.E.] and his parents, and that it would be inappropriate and likely ineffective to try and address that in a school-based counseling session." (*Id.* at 722–23.)

In September 2010, W.E. began eighth grade. (Pls.' Cross 56.1 ¶ 105; Def.'s Cross 56.1 ¶ 105.) From the beginning, W.E.'s migraines caused additional problems for him, causing him to miss not only the first several days of school from September 27–29, 2010, but also causing him to miss over 100 days throughout the school year despite his ongoing efforts to attend. (*See* Case I Hr'g Tr. 883; Case I Joint Ex. 67 (8th grade attendance summary); Case I Joint Ex. 70 (8th Grade Report Card); *see also* Def.'s 56.1 ¶¶ 26–27; Pls.' 56.1 ¶¶ 26–27; Pls.' Cross 56.1 ¶¶ 106, 108–09, 111–12, 126, 130; Def.'s Cross 56.1 ¶¶ 106, 108–09, 111–12, 126, 130.) During this time, M.S. emailed W.E.'s teachers and other District employees frequently, whom she found supportive and helpful and who emailed W.E.'s missing homework. (*See* Case I Hr'g Tr. 1661; Case I Joint Exs. 22, 23 (emails reflecting communications between M.S. and school employees); Case I Pls.' Exs. T, V, W, X (same). In some circumstances, the teachers waived homework assignments for W.E. (*See* Case I Pls.' Exs. DD, GG.)

Unsurprisingly, W.E.'s migraines had a particularly strong impact upon his eighth grade year: Socially, W.E. was "out of the loop" in school, became more socially isolated, and, according to Dr. Andrew Robins ("Dr. Robins"), felt behind his friends. (*See* Case I Hr'g Tr. 1016, 1041–42; *see also* Pls.' Cross 56.1 ¶¶ 128–29; Def.'s Cross 56.1 ¶¶ 128–29.) Medically, in M.S.'s view, the stress that W.E. felt from school made his headaches worse. (*See* Case I Joint Ex. 31 (Section 504 and CSE referral email chain); *see also* Pls.' Cross 56.1 ¶ 127; Def.'s Cross 56.1 ¶ 127.) Academically, although W.E. regularly earned As and Bs in his first quarter of school, earned a proficient score on the English Language Arts exam, and an 82 on the Regents state algebra exam, (*see* Case I Hr'g Tr. 420–21, 990; Case I Joint Ex. 70 (8th Grade

Report Card); *see also* Def.'s 56.1 ¶¶ 28–29, Pls.' 56.1 ¶¶ 28–29), he also struggled, dropping his accelerated Enriched English class, taking a "medical" with no academic credit in most classes, and missing the Regents Exam in biology, the state math assessment, and over 30 days of school after April 15, 2011, (*see* Case I Hr'g Tr. 1247, 1308, 1335–37, 1687; Case I Joint Ex. 70 (8th Grade Report Card); *see also* Def.'s 56.1 ¶¶ 30, 60; Pls.' 56.1 ¶¶ 30, 60; Pls.' Cross 56.1 ¶¶ 133–38; Def.'s Cross 56.1 ¶¶ 133–38).

The Parties undertook certain actions with respect to W.E.'s conditions: For their part, W.E.'s parents sought treatment for W.E.'s condition, tried to coax him to attend school, had family members tutor W.E., and sought medical treatment from specialized doctors.  (*See* Case I Hr'g Tr. 1664, 1718, 1910–11; *see also* Pls.' Cross 56.1 ¶¶ 140–41, 143; Def.'s Cross 56.1 ¶¶ 140–41, 143.)  Additionally, as noted, under his Section 504 plan, W.E. was also entitled, through the District, to home tutoring.  (Case I Joint Ex. 11 (Section 504 Accommodation Plan).) According to Bolen, W.E.'s case manager for eighth grade, W.E. required tutoring services in fall of 2010 in connection with certain skills testing that W.E. was to go through as part of the curriculum.  (*See* Case I Hr'g Tr. 1206–07; Case I Def.'s Exs. 46–48 (emails between M.S. and Bolen regarding tutoring).)  To that end, W.E.'s appointed tutor was Jan Dyckman ("Mr. Dyckman").  (*See* Case I Hr'g Tr. 1206–07; Case I Def.'s Exs. 34 (tutoring records), 46–48 (emails between M.S. and Bolen re tutoring).)  As a general matter, once a tutor has been secured for a student, school officials customarily leave it to the parent and the teacher to schedule the actual tutoring sessions, (*see* Case I Hr'g Tr. 1203), although school officials are ultimately responsible for ensuring that the tutoring occurred or to note why it failed to happen, (*see id.* at 355–56).  And here, while Jacqueline Kilanowski ("Kilanowski"), the guidance counselor who took over for Bolen, testified to being in touch with M.S. and W.E.'s teachers concerning the

tutoring, she did not confirm the number of hours of home instruction being provided.  (*See* Case I Hr'g Tr. 1285, 1332–33.)  The records reflect that W.E. received at least some tutoring: According to the District's timesheets, W.E. received one hour of tutoring from Mr. Dyckman on September 29, 2010, two hours from Mr. Dyckman in November 2010, 2.5 hours from Donna Sullivan in April 2011, one hour from Timothy Cavanaugh in April 2011, 4.5 hours from Donna Sullivan in May 2011, three hours from Timothy Cavanaugh in May 2011, and 2.25 hours from Donna Sullivan in June 2011.  (Case I Def.'s Ex. 34 (timesheets).)[3]  According to Bolen, W.E. was not available to work during the time that he was out in November, (*see* Case I Hr'g Tr. 1276); however, Plaintiffs object to this assertion, noting that M.S. had indicated only that W.E. could not work with Mr. Dyckman, (*compare* Def.'s 56.1 ¶ 38, *with* Pls.' 56.1 ¶ 38 (citing Case I Hr'g Tr. 1668; Case I Pls.' Ex. V)), who, Plaintiffs assert, did not really tutor W.E., (*see* Pls.' 56.1 ¶ 37), because, in M.S.'s view, he "really just supervised [W.E.] doing whatever work there was," (Case I Hr'g Tr. 1667).  Accordingly, M.S. emailed Dr. Alice Gottlieb ("Dr. Gottlieb"), the Assistant Superintendent for Curriculum and Professional Personnel, on January 28, 2011 to request a new tutor.  (*See* Case I Joint Ex. 19.)  Dr. Gottlieb promptly responded and said that she would help.  (*See id.*)  Nevertheless, according to M.S., she did not hear back and, so, reached out again in March, with home instruction ultimately recommencing for W.E. in April 2011.  (*See* Case I Hr'g Tr. 1668–69.)

---

[3] These figures come to a grand total of 16.25 hours.  The Parents' assert that W.E. received 15.25 hours in tutoring, perhaps because they do not count the first hour in November 2010 as it involved the administration of a standardized test.  (*See* Pls.' 56.1 ¶ 34.)  Plaintiffs posit that W.E. was entitled to substantially more tutoring and that the District was not monitoring W.E.'s home tutoring as it should have been, (*see* Pls.' Cross 56.1 ¶¶ 240, 252–53 (citing, inter alia, Case I Pls.' Ex. I (District Policy #4421)); however, as Defendant rightly points out, that is a legal conclusion, (*see* Def.'s Cross 56.1 ¶ 240), and one which is not necessary to resolve the instant motions.

In December 2010, M.S., informing the District that she perceived her son to be in "crisis," (*see* Case I Hr'g Tr. 1682; Case I Joint Ex. 17 (Dec. 2010 email chain); *see also* Pls.' Cross 56.1 ¶ 167; Def.'s Cross 56.1 ¶ 167), requested several types of action be taken by the District and/or school employees, including asking for class notes for W.E.'s science, French, and social studies class notes, (*see* Case I Joint Ex. 17 (Dec. 2010 email chain)).  M.S. also contacted Dr. Brodsky for information about school-based counseling and interventions, in response to which Dr. Brodsky recommended "private relaxation counseling."  (*See* Case I Hr'g Tr. 1678–79; *see also* Pls.' Cross 56.1 ¶¶ 156–57; Def.'s Cross 56.1 ¶¶ 156–57.)  Furthermore, M.S. also requested a teacher team meeting, in response to which a team of W.E.'s teachers met the week before the break in December 2010, and at which they, with M.S. present, went through and modified W.E.'s outstanding assignments to determine what work needed to be made up. (*See* Case I Hr'g Tr. 1296–97; *see also* Def.'s 56.1 ¶ 51; Pls.' 56.1 ¶ 51.)  Additionally, by email dated December 13, 2010, M.S. requested a review of W.E.'s Section 504 Plan, and the District scheduled a Section 504 committee meeting for January 5, 2011.  (*See* Case I Def.'s Ex. 7; *see also* Def.'s 56.1 ¶¶ 48–49; Pls.' 56.1 ¶¶ 48–49.)  This final meeting, however, never occurred because two days before the meeting, M.S. emailed Caroline Almeida ("Almeida"), the District's Assistant Director of Pupil Personnel, and indicated that, although she "[was] happy to meet if the team would like to or if [Almeida] ha[d] other ideas," she "[did] not know if the meeting [was] necessary," as W.E. had had a "great [December] break," was doing much better, and "ha[d] all the program modifications in place," further noting that she "met with his team before break to make sure they understood what was going on."  (*See* Case I Def.'s Ex. 7; *see also* Def.'s 56.1 ¶¶ 52–53; Pls.' 56.1 ¶¶ 52–53.)

Throughout the spring, discussions concerning W.E.'s well-being continued: On March 15, 2011, M.S. emailed the school nurse and guidance counselor a copy of a report from Dr. Kitaj, which noted, among other things, that W.E. was taking a number of medications.  (*See* Case I Joint Exs. 22 (Kitaj Report), 23 (email attaching Kitaj report).)  The report indicated that W.E. "present[ed] with a diagnosis of migraine without aura" and that "[W.E.] confirm[ed] triggers of his headaches from stress."  (Case II Joint Ex. 22 (Kitaj report), at 2, 5.)  In her email transmitting it to the school, M.S. characterized the report as "not[ing] that [W.E.] does have a severe migraine disability and that stress is one precipitating factor."  (Case I Joint Ex. 23 (email attaching Kitaj report).)  Soon thereafter, on March 18, 2011, the IST had a meeting at which, among other things, it set its goal as to "ensure student receives tutoring."  (Case I Def.'s Ex. 16 (meeting overview); *see also* Pls.' Cross 56.1 ¶ 173; Def.'s Cross 56.1 ¶ 173.)  Additionally, on April 12, 2011, Plaintiffs referred W.E. to the CSE to determine whether he was eligible for special education services as a child with an "other health impairment" ("OHI") and requested an emergency Section 504 meeting, which Almeida immediately scheduled for April 15, 2011. (Case I Hr'g Tr. 485; Case I Joint Exs. 28 (M.S. Referral Email), 30 (Section 504 Meeting Notice); *see also* Def.'s 56.1 ¶¶ 56–58; Pls.' 56.1 ¶¶ 56–58.)

At the April 15, 2011 Section 504 Committee meeting, the Committee recommended adding counseling to W.E.'s accommodation plan for the rest of the year.  (*See* Joint Ex. 35 (Section 504 accommodation plan), at 2.)  Based on his prior relationship with W.E., Dr. Brodsky recommended that any such counseling occur outside, perhaps on a trail or ropes course.  (*See* Case I Hr'g Tr. 744–45.)  Nevertheless, Dr. Brodsky testified that he did not meet

with W.E. to provide counseling because "[h]e was never available when [Dr. Brodsky] sought him out," despite having called W.E.'s homeroom more than five times.  (*See id.* at 746, 784.)[4]

Also at the Section 504 meeting, "[a] psychiatric evaluation was recommended to be conducted in preparation for the upcoming initial [Committee on Special Education ("CSE")] meeting."  (*See* Case I Joint Ex. 35, at 2.)  The evaluation was scheduled to take place on May 5, 2011 with a psychiatrist named Dr. Hahn.  (*See* Case I Hr'g Tr. 492; *see also* Pls.' Cross 56.1 ¶ 189; Def.'s Cross 56.1 ¶ 189.)  When Dr. Hahn spoke with M.S. on the phone, she offered to let him see W.E. at home, but Dr. Hahn indicated that he did not think it would be helpful to see W.E. in a migraine state at home and suggested that M.S. contact Dr. Cynthia Pfeffer ("Dr. Pfeffer") at New York Presbyterian Hospital regarding pain management.  (*See* Case I Hr'g Tr. 1700–03; *see also* Pls.' Cross 56.1 ¶¶ 192–95; Def.'s Cross 56.1 ¶¶ 192–95.)  M.S. did so, and Dr. Pfeffer referred her to another doctor, Dr. Daniel Williams ("Dr. Williams").  (*See* Case I Hr'g Tr. 1703–05; *see also* Pls.' Cross 56.1 ¶ 196; Def.'s Cross 56.1 ¶ 196.)  M.S. contacted Dr. Williams the same day, provided extensive background, and arranged to schedule an appointment.  (*See* Case I Hr'g Tr. 1703–05; *see also* Pls.' Cross 56.1 ¶ 197; Def.'s Cross 56.1 ¶ 197.)  M.S. and W.E. then met with Dr. Williams on May 18, 2011, and W.E. had at least 11 subsequent sessions with Dr. Williams by December 21, 2011.  (*See* Case I Hr'g Tr. 882, 895, 934, 1703–05; *see also* Pls.' Cross 56.1 ¶¶ 197–99; Def.'s Cross 56.1 ¶¶ 197–99.)

Although Dr. Hahn did not meet with W.E. on the day when he spoke with M.S., he nevertheless prepared a report based on that consultation, (*see* Pls.' Cross 56.1 ¶ 200; Def.'s

---

[4] Plaintiffs indicate that Dr. Brodsky did not contact the Parents until June 9, 2011, (Pls.' 56.1 ¶ 59 (citing Case I Joint Ex. 47)), but this date was drawn from an email from M.S. to Dr. Brodsky that does not indicate when Dr. Brodsky first tried to contact the Parents, (*see* Case I Joint Ex. 47).

Cross 56.1 ¶ 200), which noted that he suggested that "[the] best approach to assist [W.E.] would be to consider a multi-disciplinary approach," recommending "a more holistic approach incorporating bio-feedback/relaxation techniques, mindfulness training, [and] play therapy," and noting that "[a]ccess to an outdoor adventure[-]based program may be deemed to be one avenue to help engage [W.E.] in learning coping mechanisms for stress." (Case I Joint Ex. 43, at 2–3.) This did not, however, mark the end of the efforts of Dr. Hahn to meet with W.E., and M.S. testified that she scheduled an appointment with Dr. Hahn for June 1, 2011, (*see* Case I Hr'g Tr. 1717), but she canceled the appointment because W.E. was home with a migraine, (*see id.*; *see also* Pls.' Cross 56.1 ¶ 202, Def.'s Cross 56.1 ¶ 202), although W.E. had seen a number of other doctors on different occasions while in the throes of a headache or migraine, (*see* Def.'s 56.1 ¶¶ 70–73; Pls.' 56.1 ¶¶ 70–73). Additionally, according to Coughlin, M.S. accepted another appointment slot for W.E. with Dr. Hahn for July 19, 2011, which did not occur because W.E. was too anxious to participate. (*See* Case I Hr'g Tr. 158–60; *see also* Def.'s 56.1 ¶ 68; Pls.' 56.1 ¶ 68.) During that phone call, according to Coughlin, M.S. also indicated that they were considering placing W.E. at Northwood and that medical reports were forthcoming, but that she nonetheless wanted to secure a CSE placement. (*See* Case I Hr'g Tr. 161–64; *see also* Def.'s 56.1 ¶ 69; Pls.' 56.1 ¶ 69.)

The initial CSE referral meeting was scheduled for W.E. for May 25, 2011, (*see* Case I Hr'g Tr. 503; *see also* Def.'s 56.1 ¶ 74; Pls.' 56.1 ¶ 74), because, according to Almeida, it "had to be held by June 13th in order to be in compliance with the timeline, but [the] mom indicated that she was only available on Mondays and Wednesdays," and May 25 was "the only date prior to June 13th that was a Monday or Wednesday that was available," (Case I Hr'g Tr. 503–04). In advance of that meeting, M.S. provided a revised social history for W.E., (*see* Case I Joint Ex. 40

(revised social history); *see also* Pls.' Cross 56.1 ¶¶ 184–85; Def.'s Cross 56.1 ¶¶ 184–85);

however, Plaintiffs did not receive any written letter suggesting that a psychiatric evaluation may

also be needed, (*see* Pls.' Cross 56.1 ¶ 230 (citing Case I Hr'g Tr. 364); Def.'s Cross 56.1 ¶ 230),

and the evaluation with Dr. Hahn, as discussed above, did not occur.  According to Almeida, the

prospect of pressing on with the CSE meeting without a psychiatric evaluation concerned her

because she "felt that they were critical for the committee to be able to make a decision not only

on eligibility but [also] on . . . an appropriate program," and that she shared these concerns with

Coughlin.  (Case I Hr'g Tr. 505.)  In advance of that meeting, the District did not conduct a

classroom observation or include a parent as a member of the CSE, (*see* Pls.' Cross 56.1 ¶¶ 204–

05; Def.'s Cross 56.1 ¶¶ 204–05; *see also* Case I Joint Ex. 42 (letter notifying the Parents of the

May 25, 2011 meeting and listing people expected to attend the meeting)), nor did the District

list a reason for referral on its 504 Referral Form, (*see* Case I Joint Ex. 39 (504 Referral Form)),

even though Coughlin testified that she "would typically expect there would be some

information on" the form, (*see* Case I Hr'g Tr. 336).

The CSE meeting in fact went forward on May 25, 2011, (*see* Case I Joint Ex. 45 (CSE

meeting attendance form); *see also* Pls.' Cross 56.1 ¶ 208; Def.'s Cross 56.1 ¶ 208), and

Plaintiffs take issue with several aspects of the meeting.  For one thing, the Parents note that

there was no parent member at the meeting.  (*See* Case I Hr'g Tr. 233; Case I Joint Ex. 45 (CSE

meeting attendance form); *see also* Pls.' Cross 56.1 ¶ 204; Def.'s Cross 56.1 ¶ 204.)

Additionally, Plaintiffs take issue with a number of the respects in which Almeida conducted the

meeting, noting that Almeida opened the meeting by saying that she did not know if W.E.

qualified to be classified or, if he did, whether the District had any placement options for him.

(*See* Case I Hr'g Tr. 1708; Case I Joint Ex. 58 (Oct. 26, 2011 letter from M.S. to Coughlin), at 2;

15

*see also* Pls.' Cross 56.1 ¶ 209; Def.'s Cross 56.1 ¶ 209.)  Furthermore, at the time of that

meeting, according to Almeida, although she knew that W.E. had "numerous absences" and had

"a lot of medical information speaking about a lot of physical impairments" and "[h]eavy duty

medications, different doctors, [and] lots of medical type interventions," she did not have "more

holistic information" that "would give [the committee] a clearer picture of [W.E.]'s emotional

needs" and did not know the specifics concerning his medications, frequency of absences, or that

his migraines were growing worse.  (*See* Case I Hr'g Tr. 513–16, 653–54, 657, 661.)

Furthermore, while Almeida acknowledged that it was possible to classify W.E. as OHI, she did

not, (*see* Case I Hr'g Tr. 662; *see also* Pls.' Cross 56.1 ¶ 218, Def.'s Cross 56.1 ¶ 218), and

questioned "[i]n [her] own head" whether W.E.'s pain in fact existed, (Case I Hr'g Tr. 678), and

testified that, at the time of the meeting, she "had information that[,] on weekends and at

nights[,] he was quite active going out with friends . . . [,] and was still social and active on the

weekend certainly," specifically noting that that "there was a concert in the city that was

mentioned at this time," (Case I Hr'g Tr. 517), although M.S. testified that during the period

from November 2010 through January 2011, W.E. "had no social connections," "no phone

calls, . . . no get togethers with friends," although he did, she said, have a small birthday party,

(*id.* at 1664).  Relatedly, Plaintiffs also object to the fact that Almeida shared an anecdote from

her childhood about her father forcing her to go to school when she did not feel well, (*see id.* at

509–10), a story M.S. found "insulting" and "patronizing," (*id.* at 1715).  Finally, Plaintiffs

contend that M.S. testified that no accommodations other than classifying W.E. as OHI were

discussed at the meeting.  (*See* Pls.' Cross 56.1 ¶ 228 (citing Case I Hr'g Tr. 1712).)

     The Parents also note respects in which they were dissatisfied with the District's conduct

following the meeting.  Specifically, they note that the District did not send out a notice

concerning the status of W.E.'s referral after the meeting (or, for that matter, before), nor did it

classify W.E. by June 13, 2011, (*see* Case I Hr'g Tr. 368–69; *see also* Pls.' Cross 56.1 ¶¶ 229,

231; Def.'s Cross 56.1 ¶¶ 229, 231), the date by which Almeida had indicated that she wanted to

hold W.E.'s CSE meeting.

### 2.  Planning for W.E.'s Freshman Year

In July 2011, Coughlin spoke with M.S. concerning whether she wished to pursue

classification and an IEP for W.E.  (*See* Case I Hr'g Tr. 159–60.)  The CSE thereafter

reconvened on August 26, 2011 and ultimately classified W.E. as a student with a disability

under the classification of "Other Health Impairment," (*see* Case I Hr'g Tr. 183; Case I Def.'s

Ex. 30 (May 25, 2011 meeting notes); *see also* Def.'s 56.1 ¶ 79, Pls.' 56.1 ¶ 79), and identified

W.E.'s academic as well as social and emotional needs and goals, along with the modifications,

services, and supports to meet them, (*see* Case I Def.'s Ex. 30 (May 25, 2011 meeting notes)).  In

advance of that meeting, the Parents submitted letters from Dr. Williams, Dr. Robins, and Dr.

Lasser.  (*See* Case I Joint Exs. 50a, 50b, 51.)  In those letters, Dr. Williams recommended a

"smaller school environment, with small classes, where [W.E.] [could] receive both supportive

counseling and educational services that enable him to return to normal social and educational

functioning," (*see* Case I Joint Ex. 50a (Williams letter), at 2); Dr. Lasser recommended a "small

supportive school environment," (*see* Case I Joint Ex. 50b (Lasser letter)); and Dr. Robins was of

the view that "it [was] unlikely that [W.E.] [would] succeed in the 9th grade if he continue[d] in

the mainstream public school system," (*see* Case I Joint Ex. 51 (Robins letter), at 2).

The CSE prepared a draft IEP for W.E., which listed a number of recommendations,

including twice-weekly individual counseling services, program accommodations (comprising

access to class notes, additional time for assignments, and nursing services as needed), and

"Special Class" with student-to-staff ratio of "8:1:1," although it left blank the field reserved for placement recommendations.  (*See* Case I Joint Ex. 53, at 7–9.)  To that end, Coughlin testified that, at the meeting, she discussed "two programs that [she] thought might be appropriate and be able to meet the needs that the committee had determined that [W.E.] had," specifically the BOCES programs in Southern Westchester and Putnam Northern Westchester, (Case I Hr'g Tr. 179–80), although M.S., writing in an October 17, 2011 email to Coughlin, claimed that M.S. "stated that it was too late . . . to seriously consider a CSE out of district placement . . . , given the late date of the [CSE] meeting," (Case I Joint Ex. 56; *see also* Case I Joint Ex. 58 (Oct. 26, 2011 letter from M.S. to Coughlin) at 3).[5]  According to Coughlin, she described the referral process at the meeting and said that until the process was complete, neither proposal could be recommended as a final placement, but that, instead, all the CSE could offer was interim home instruction pending the expedited referral process.  (*See* Case I Hr'g Tr. 191–95.)  A bit later on, on November 2, 2011, the Parents received a draft IEP when copied on a letter from Coughlin to the intake coordinator at the Southern Westchester BOCES.  (*See* Case I Joint Ex. 59.)  Later that month, M.S. visited the Southern Westchester and W.A. visited the Putnam Northern Westchester program; however, M.S. indicated that W.E. would not be available to visit either. (*See* Case I Joint Ex. 63; Case II Hr'g Tr. 1168; *see also* Def.'s 56.1 ¶¶ 56.1 89–90; Pls.' 56.1 ¶¶ 89–90.)  During those visits, M.S. learned that the placements had a 12:1:1 student-to-teacher ratio, (*see* Case I Joint Ex. 63, at 2), rather than the 8:1:1 ratio listed on the draft IEP, (*see* Case I Joint Ex. 53, at 8; *see also* Pls.' Cross 56.1 ¶¶ 526–27; Def.'s Cross 56.1 ¶¶ 526–27).

---

[5] Context suggests that BOCES refers to New York's Boards of Cooperative Educational Services.  *See* http://www.boces.org/AboutBOCES/WhatisaBOCES.aspx.

Despite these discussions of possibly placing W.E. in a BOCES program, on August 9, 2011, M.S. raised for the first time in a phone call with Coughlin that the Parents may seek tuition reimbursement for their unilateral placement of W.E. at Northwood.  (*See* Case I Hr'g Tr. 168; *see also* Def.'s 56.1 ¶ 112; Pls.' 56.1 ¶ 112.)  By letter dated August 30, 2011, the Parents formally informed the superintendent that they were withdrawing W.E. from the District and further indicated that they had informed the committee the week before.  (*See* Case I Joint Ex. 54.)

W.E., in fact, attended Northwood for his freshman and sophomore years, (Pls.' Cross 56.1 ¶ 265; Def.'s Cross 56.1 ¶ 265); however, the process by which he came to attend a private school began earlier, with the Parents having requested that transcripts be sent to area private schools in mid-January 2011, (*see* Case I Def.'s Ex. 11 (transcript requests); *see also* Def.'s 56.1 ¶ 91; Pls.' 56.1 ¶ 91; Pls.' Cross 56.1 ¶¶ 299–300; Def.'s Cross 56.1 ¶¶ 299–300).  Plaintiffs learned of Northwood through one of W.A.'s colleagues, whose son was experiencing anxiety and depression in public high school.  (*See* Case I Hr'g Tr. 1802; *see also* Def.'s 56.1 ¶ 92; Pls.' 56.1 ¶ 92.)  M.S. visited Northwood with W.E. in late February 2011, and, after receiving a tour, W.E. grabbed M.S.'s coat and said, "Can I go here?"  (*See* Case I Hr'g Tr. 1803–04; *see also* Def.'s 56.1 ¶¶ 93–94; Pls.' 56.1 ¶¶ 93–94; Pls.' Cross 56.1 ¶ 301; Def.'s Cross 56.1 ¶ 301.)  Shortly thereafter, Plaintiffs submitted W.E.'s application, and after W.E. was admitted, signed a contract for enrollment in March 2011, mailed a $2,500 deposit, purchased tuition insurance at a cost of approximately $1,700, visited the school again with W.A., and sent an email to the school in late May with the subject line "Incoming ninth grader [W.E.]," indicating that W.E. would be attending in the fall for ninth grade.  (*See* Case I Joint Ex. 20a (records request); Case I Pls.' Exs. B (enrollment contract), II (Northwood application); Case I Def.'s Exs. 53 (Northwood

admission letter), 55 (email from M.S. to Northwood (Feb. 8, 2012)); *see also* Def.'s 56.1 ¶¶ 95–101; Pls.' 56.1 ¶¶ 95–101; Pls.' Cross 56.1 ¶¶ 302–05; Def.'s Cross 56.1 ¶¶ 302–05.)  The School was aware of W.E.'s unique needs when it accepted him.  (*See* Case I Hr'g Tr. 1560–61; *see also* Pls.' Cross 56.1 ¶ 310; Def.'s Cross 56.1 ¶ 310.)  M.S. explained her application by indicating that she "hop[ed] for a public placement" such that "[W.E.] could stay in the school district," but, "at the same time[,] . . . had to look out for [W.E.'s] interests and come up with something that was a change for him and would improve his health and allow him to access his education."  (Case I Hr'g Tr. 1956–57.)

Despite the ongoing consideration of private school, the Parties dispute when Plaintiffs first raised the issue of W.E. attending private school.  According to Defendant, it was not until a mid-July 2011 telephone call with Coughlin that M.S. mentioned the possibility.  (*See* Def.'s 56.1 ¶ 102 (citing Case I Hr'g Tr. 156)).  Plaintiffs assert that M.S. informed the CSE in mid-May 2011.  (*See* Pls.' 56.1 ¶ 102 (citing Case I Def.'s Ex. 25 (May 25 notes)).)  Notes from Dr. Robins from as early as April 2011 and Dr. Williams from as early as May 2011 allude to W.E. attending or considering attending private school, including a reference to Northwood.  (*See* Case I Def.'s Exs. 38 (notes), 41 (notes); *see also* Def.'s 56.1 ¶¶ 105–10; Pls.' ¶¶ 105–10.)

### 3.  W.E.'s Freshman Year at Northwood

Before describing W.E.'s performance at Northwood, it bears discussing the school itself. Northwood describes itself as a small supportive, college preparatory school, and it focuses on and endeavors to incorporate into all things five core values: integrity, compassion, responsibility, courage, and respect.  (*See* Case I Hr'g Tr. 1552–53; Case I Pls.' Ex. LL (Northwood promotional material); Case II Hr'g Tr. 599–600; *see also* Pls.' Cross 56.1 ¶¶ 269, 280–81, 284; Def.'s Cross 56.1 ¶¶ 269, 280–81, 284.)  It purports to take steps to allow for its

students to be distinct individuals. (*See* Case II Hr'g Tr. 590; *see also* Pls.' Cross 56.1 ¶ 282; Def.'s Cross 56.1 ¶ 282.) In at least some classes, the students and teacher discuss the material while seated around a large oval table in a manner such that a student "[cannot] get through a class without being asked something or being forced to participate." (Case II Hr'g Tr. 384–86.) Its student body is a mix of day and boarding students and the student-teacher ratio for W.E.'s classes is below 8:1, (*see* Case I Hr'g Tr. 1558, 1807; Case II Hr'g Tr. 400; *see also* Pls.' Cross 56.1 ¶¶ 270–73; Def.'s Cross 56.1 ¶¶ 270–73), although its average class size is probably between 10 and 12 students, (*see* Case II Hr'g Tr. 445). The school also has two fulltime nurses, and its faculty is around the students regularly. (*See* Case I Hr'g Tr. 1561, Case II Hr'g Tr. 365–66, 441, 610–11; *see also* Pls.' Cross 56.1 ¶¶ 274, 283; Def.'s Cross 56.1 ¶¶ 274, 283.) The School does not have a consulting psychologist or consulting psychiatrist on staff. (*See* Case II Hr'g Tr. 463.) During the afternoon, students have an organized study period in the school library, and, for boarders, there is an additional two-hour mandatory study period each evening, during which time the school disconnects internet access and requires students to work away from their computers for the first hour. (*See* Case I Hr'g Tr. 1577, 1782–83, 1817; *see also* Pls.' Cross 56.1 ¶¶ 276–78; Def.'s Cross 56.1 ¶¶ 276–78.) The school also provides a number of outdoor activities, which Dr. Robins indicated would be therapeutic for W.E., and W.E. participated in community service as well as a rock-climbing program where he was responsible for the safety of others. (*See* Case I Hr'g Tr. 1555–58, 1565; Case II Hr'g Tr. 1057; *see also* Pls.' Cross 56.1 ¶¶ 287–88, 350; Def.'s Cross 56.1 ¶¶ 287–88, 350.)

      The Parties take different positions on the extent to which the School could be termed therapeutic, although they point to much of the same testimony. At the hearing, Donald Mellor ("Mellor"), an English teacher and Northwood counselor, explained that while the School "[is]

not a therapeutic school" and "[does not] claim to be," it is nevertheless "by nature therapeutic," (Case I Hr'g Tr. 1541, 1550, 1581; *see also* Case I Hr'g Tr. 1806 (testimony by M.S. that the School "was a therapeutic environment without being overtly therapeutic")), and that, for some students, the school is "really good medicine," (Case II Hr'g Tr. 590).  Additionally, in a September 2, 2011 email to M.S., Mellor stressed that while Northwood "[does not] call [itself] a therapeutic school," its staff "ha[d] a lot of faith in the school's therapeutic culture," and indicated that he "trust[ed] that [W.E.] . . . [would] see [it] as a positive and psychologically safe place."  (Case I Pls.' Ex. VV; *see also* Pls.' Cross 56.1 ¶¶ 364–65; Def.'s Cross 56.1 ¶¶ 364–65; Case II Hr'g Tr. 655, 658 (indicating that Mellor testified that the School strove to be "psychologically safe," but that that philosophy was "not codified enough").)

When W.E. began at Northwood in September 2011, he was one of 17 students in his freshman class.  (*See* Pls.' Cross 56.1 ¶¶ 307–08; Def.'s Cross 56.1 ¶¶ 307–08.)  That year, he took English, Spanish, Geometry, Honors Biology, and World Cultures, (*see* Case I Pls.' Ex. PP (1st marking period report card)), earning passing grades in each, (*see id.*; Case I Hr'g Tr. 1815; *see also* Pls.' Cross 56.1 ¶ 311; Def.'s Cross 56.1 ¶ 311).  In addition, Northwood ensured that W.E.'s teachers were aware of an accommodation plan for W.E.'s freshman year, (*see* Case I Hr'g Tr. 1562–64, 1789–90, 1807; Case II Hr'g Tr. 434–48; Aff. of Redacted in Supp. of Pls.' Cross Mot. for Summ. J. ("John Doe Aff.") (Dkt. No. 39); Pls.' Cross 56.1 ¶¶ 312, 314; Def.'s Cross 56.1 ¶¶ 312, 314), which provided for (1) extended time for in-class assignments, (2) preferential seating, (3) the provision of graphic organizers or guided notes to support information presented verbally, and (4) regular counseling sessions with the school counselor, (*see* Case I Pls.' Ex. MM).  According to testimony from John Spear ("Spear"), the director of college guidance at Northwood, there was an "initial accommodation plan that was developed in

August or very early September," but that it was "revised . . . a little bit" after meeting with the family to review the District's new IEP and then distributed to the teachers.  (*See* Case II Hr'g Tr. 423–24, 434–35.)[6]  Additionally, Spear testified that he would talk with teachers about students informally throughout the year and would make announcements concerning students with accommodation plans at faculty meetings, including "reinforc[ing] . . . accommodations that students have."  (*See* Case II Hr'g Tr. 464–66.)

---

[6] In paragraph 315 of their Cross 56.1 statement, Plaintiffs assert that "Administrator [redacted] distributed the plan to each teacher at the start of the school year," citing a portion of the above-cited hearing transcript as well as "Affidavit of [redacted] dated May 22, 2015."  The Court takes it that this is a reference to the "Affidavit of [redacted]" dated May 18, 2015, in which Northwood's College Guidance Director indicated that he, "[a]s a general practice, just before the start of the year, . . . . [would] meet with the specific faculty members who will teach [a] student [who has a specific accommodation plan] during the upcoming year and cover what information [the School] ha[d] about the student and the provisions . . . of the student's plan." (John Doe Aff. ¶¶ 1, 12.)  Defendant objects on the grounds that the affidavit was not offered during the impartial hearings or appeals to the SRO in either case.  (Def.'s Cross 56.1 ¶ 314.) However, "[t]his Court may consider evidence that is not part of the administrative record at the request of a party."  *J.C. v. N.Y.C. Dep't of Educ.*, No. 15-CV-3345, 2015 WL 8940044, at *15 (S.D.N.Y. Dec. 16, 2015) (citing, inter alia, 20 U.S.C. § 1415(i)(2)(C)(ii)), *adopted by* 2016 WL 828138 (S.D.N.Y. Feb. 29, 2016); *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) ("Federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." (internal quotation marks omitted)).  "[C]ourts generally accept evidence that was not withheld in bad faith, is relevant, and does not change the administrative review into a trial de novo."  *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 554 n.1 (S.D.N.Y. 2010), *aff'd sub nom. G.B. v. Tuxedo Union Free Sch. Dist.*, 486 F. App'x 954 (2d Cir. 2012).

Here, although Defendant argues that Plaintiffs' submission of this affidavit checks all three boxes, (*see* Def.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. & To Amend Answer 14–15 (Dkt. No. 43)), it singles out for particular emphasis that Plaintiffs never gave any indication in the administrative proceedings below that they wished to call the affiant as a witness.  While the decision to provide an affidavit from a witness who could have testified (and, therefore, been cross-examined), may, at least at times, fairly raise eyebrows, the Court is not convinced that circumstances here reveal bad faith or present evidence that is either irrelevant or would lead to a "trial de novo."  *G.B.*, 751 F. Supp. 2d at 554 n.1.

The record also contains evidence concerning how W.E.'s interaction with School employees, including as part of his plan, worked in practice.  Plaintiff had a nurse assigned as his faculty advisor, and another nurse lived on the end of his dormitory floor.  (*See* Case I Hr'g Tr. 1561–62; *see also* Pls.' Cross 56.1 ¶¶ 319–20; Def.'s Cross 56.1 ¶¶ 319–20.)  According to Spear, the nurses are on call 24 hours a day, although they are generally in their office for only certain portions of the day.  (*See* Case II Hr'g Tr. 438–39.)  Nevertheless, M.S. testified that W.E. received very careful monitoring from the nurses.  (*See* Case II Hr'g Tr. 1236–37, 1239; *see also* Case II Pls.' Exs. T, U (logs).)  Additionally, with respect to counseling, Mellor's sessions with W.E. were initially "very structured," but later "certainly got less formal," and included, for instance, Mellor stopping by W.E.'s room to chat or "walk[ing] a trail on the way to a cliff."  (Case I Hr'g Tr. 1564; *see also* Case II Hr'g Tr. 621–24.)  As Mellor explained it, the approach changed because, while in Mellor's office, "it seemed clear to [Mellor] early on that [W.E.] just fidgeted and didn't want to have these conversations," saying as little as he could.  (Case II Hr'g Tr. 622.)  As a result, Mellor "got creative" even though he "[thought] [W.E.'s] parents expected [him] to have a weekly meeting year long."  (Case II Hr'g Tr. 623.)[7]  Mellor, who was not a New York State certified teacher and who had never worked in a school district as a school counselor, did not perform an official or documented observation of W.E. in class and did not take notes from his counseling sessions.  (*See* Case I Hr'g Tr. 1749–50, 1770; *see also* Def.'s 56.1 ¶¶ 116–17, 121; Pls.' 56.1 ¶¶ 116–17, 121.)

In many regards, W.E.'s performance improved while at Northwood.  With respect to grades, W.E. earned marks ranging from a C to an A- during the first semester of his freshman

---

[7] Perhaps in light of this informal approach, Defendant, in its cross 56.1 statement, disputes that W.E. received counseling or therapy during 10th grade, (*see* Def.'s Cross 56.1 ¶¶ 392–93), albeit without citation to the record when doing so.

year, (*see* Case I Pls.' Ex. TT (2nd marking period report card)), and grades between C+ and A

during his second semester, (*see* Case I Pls.' Ex. PP (1st marking period report card)).

Additionally, M.S. felt that W.E.'s work improved in a number of ways, (*see* Case I Hr'g Tr.

1818–20; *see also* Pls.' Cross 56.1 ¶¶ 337–42; Def.'s Cross 56.1 ¶¶ 337–42), and at least some

teachers praised W.E.'s performance, including one who noted that he was participating in class,

(*see* Case I Hr'g Tr. 1816; *see also* Pls.' Cross 56.1 ¶ 333; Def.'s Cross 56.1 ¶ 333), and another

who observed that he was one of the strongest students in geometry, (*see* Case I Hr'g Tr. 1820;

*see also* Pls.' Cross 56.1 ¶ 343; Def.'s Cross 56.1 ¶ 343).  Additionally, W.E. went from missing

over 100 days of school due to migraines to missing just nine, (*see* Case I Joint Ex. 67 (8th grade

attendance summary); Case II Pls.' Exs. T, U (logs); *see also* Pls.' Cross 56.1 ¶ 328; Def.'s Cross

56.1 ¶ 328), consistent with an improvement in health that M.S. attributes at least in part to

Northwood, including its "seamless" environment and supportive peer structure, (*see* Case I Hr'g

Tr. 1814; Case II Hr'g Tr. 829; *see also* Pls.' Cross 56.1 ¶¶ 363, 367; Def.'s Cross 56.1 ¶¶ 363,

367).  Moreover, W.E. came to be socially well-integrated at Northwood, (*see* Case I Hr'g Tr.

1063, 1565–66, 1579–80; Case II Hr'g Tr. 603; *see also* Pls.' Cross 56.1 ¶¶ 330, 354; Def.'s

Cross 56.1 ¶¶ 330, 354), and gained additional self-confidence, growing more comfortable in his

own skin, (*see* Case II Hr'g Tr. 427–28, 443–44; *see also* Pls.' Cross 56.1 ¶ 351; Def.'s Cross

56.1 ¶ 351), which M.S. and, somewhat less full-throatedly, Spear attribute at least in part to the

small class sizes, (*see* Case II Hr'g Tr. 443–44, 826).  M.S. also believes that the accessibility of

the staff and ability to see teachers on the weekend helped W.E.  (*See* Case II Hr'g Tr. 850.)  In

terms of personal characteristics, the faculty noted that W.E. was growing appropriately, (*see id.*

at 428, 611; *see also* Pls.' Cross 56.1 ¶ 352; Def.'s Cross 56.1 ¶ 352), Mellor testified that his

teachers "love[d] him," explaining that W.E. "is just a nice funny guy who seems really well

received," (Case I Hr'g Tr. 1778), and his English teacher noted that the other students appreciate his intelligence, quirkiness, and genuineness, (*see* Case II Hr'g Tr. 610; *see also* Pls.' Cross 56.1 ¶ 353; Def.'s Cross 56.1 ¶ 353).

From a health and psychological perspective, W.E. experienced positive changes during his first year at Northwood.  By the end of his freshman year, W.E. had tapered off his prescribed Depakote, Amitriptyline, and Zoloft.  (*See* Case II Hr'g Tr. 827; *see also* Pls.' Cross 56.1 ¶¶ 424, 586; Def.'s Cross 56.1 ¶¶ 424, 586.)  Moreover, whereas, according to Dr. Robins, W.E.'s "T Score" on his BASC-2 test for his attitude toward school was, he believed, 63, a score which would "typically . . . [be] considered to be sort of at risk," albeit not clinically significant, (Case I Hr'g Tr. 1446–48, 1451), by 2010, "[a]ll of [W.E.'s] T scores were below 60," which was not in the at-risk range, (*id.* at 1447–48).  Additionally, Dr. Williams posited that the School "appear[ed] to be highly appropriate [for W.E.] as reflected in his dramatic improvement in headache frequency that ha[d] persisted for the first time in previous years beyond the summer well into the fall term and its conclusion."  (Case I Hr'g Tr. 925.)

Nevertheless, there is some evidence that W.E.'s freshman year was short of an unqualified success.  W.E.'s teachers also noted that he struggled with handing in homework assignments on time, staying organized, and preparing for class.  (*See* Case I Pls.' Exs. PP (1st marking period report card), TT (2nd marking period report card); *see also* Def.'s 56.1 ¶ 115; Pls.' 56.1 ¶ 115.)  More specifically, W.E.'s Spanish teacher opined that W.E. had "shown that he [was] fully capable of succeeding in his Spanish studies" and that the teacher "expect[ed] more from him," (Pls.' Case II Ex. H, at 1–2), an observation not dissimilar from one made by W.E.'s honors biology teacher, who said that while "[W.E.] usually worked hard," his grades "were not always at the level [she] kn[e]w he [was] capable of achieving," (*id.* at 2).  Moreover,

W.E.'s Spanish teacher also noted W.E.'s "poor" "behavior in class," citing an occasion when the teacher had to remove him from class for rude remarks made to another student.  (*See id.*; *see also* Def.'s 56.1 ¶ 131; Pls.' 56.1 ¶ 131.)  Additionally, despite a strong performance in Geometry first semester, W.E.'s teacher observed that he "limped to the finish line."  (Pls.' Case II Ex. H, at 2.)

### 4.  The District Prepares for W.E.'s Sophomore Year

Despite W.E.'s attendance at Northwood, the District persisted in formulating a program recommendation for the 2012–13, beginning the process in April 2012.  (*See* Case II Hr'g Tr. 78; *see also* Def.'s 56.1 ¶ 125; Pls.' 56.1 ¶ 125.)  Coughlin testified that she sought information from Northwood, an update on his behavioral assessment, as well as a report card, and that she also observed W.E. in his English class, where she described W.E. as having various levels of engagement and sitting in a slumped posture with his head on the table at times.  (*See* Case II Hr'g Tr. 79, 108–09; Case II Def.'s Ex. 6 (Coughlin observation form); *see also* Def.'s 56.1 ¶¶ 126–27; Pls.' 56.1 ¶¶ 126–27.)  Coughlin received the teachers' reports in early June 2012.  (*See* Case II Def.'s Ex. 8 (teacher evaluation reports); *see also* Def.'s 56.1 ¶ 128; Pls.' 56.1 ¶ 128.)  In those reports, W.E.'s English teacher noted that although W.E.'s "ability to critically think put[] him at the top of his class," he needed to focus on "organizational skills" and struggled with coming to class prepared and completing homework; his Spanish teacher, in addition to noting the incident where W.E. had to be removed from class, reported that he had difficulty coming to class prepared and completing homework assignments; and W.E.'s science teacher observed that his migraines "seem[ed] to be triggered by stress," which "le[]d to lack of sleep which feeds into the whole cycle of disorganization[] [and] missing class/missing assignments."  (*See* Case II Def.'s Ex. 8 (teacher evaluation reports), at unnumbered 2, 4, 5; *see*

*also* Def.'s 56.1 ¶¶ 129–32; Pls.' 56.1 ¶¶ 129–32.)  Additionally, in early June 2012, Coughlin

received W.E.'s report card from the third marking period, which noted that W.E. had failed to

turn in assignments on time or at all, had shown up unprepared for class, and demonstrated an

inconsistent focus and alertness in class, sometimes placing his head on his desk for a brief nap.

(*See* Case II Def.'s Ex. 15 (3rd marking period report card)); *see also* Def.'s 56.1 ¶ 134; Pls.'

56.1 ¶ 134.)

   Additionally, further testing of W.E. was done that year.  In February 2012, Dr. Robins

conducted a BASC-2, (*see* Case I Pls.' Ex. HH (Feb. 2012 BASC-2)), which Dr. Robins testified

showed no at-risk scores and showed a striking improvement with respect to W.E.'s attitude

towards school, (*see* Case I Hr'g Tr. 1448–51).  Shortly thereafter, two Northwood teachers

completed the BASC-2 for W.E. in May of 2012; however, according to Dr. Lupiani, the

District's school psychologist who scored these responses, W.E.'s English teacher rated him as

clinically significant for somatization and at risk for social skills, (*see* Case II Def.'s Ex. 13

(Lupiani Psychological Evaluation)), which Dr. Williams indicated showed that the "persistence

of vulnerabilities in [W.E.] in the areas of somatization & social skills . . . coincided with [Dr.

Williams's] ongoing clinical impressions," (Case II Def.'s Ex. 17 (Dr. Williams evaluation), at

2), assertions the Parents purport to dispute on the ground that they "question the validity of [Dr.

Lupiani's] 'psychological evaluation,'" as noted in a letter they sent Coughlin, (*see* Case II

Def.'s Ex. 26 (July 27, 2012 letter), at 4–5; *see also* Pls.' 56.1 ¶ 133).

   On June 14, 2012, the CSE held W.E.'s annual review meeting, which the Parents

attended.  (*See* Case II Hr'g Tr. 127; *see also* Def.'s 56.1 ¶ 135; Pls.' 56.1 ¶ 135; Pls.' Cross 56.1

¶ 532; Def.'s Cross 56.1 ¶ 532.)  In addition, Coughlin sent Annie Edwards ("Edwards"), the

Academic Director, an email indicating that she would like teacher input at the CSE meeting and

expressing "hop[e] that [Edwards] [would] be available by phone if there [were] no teachers available."  (*See* Case II Def.'s Ex. 7, at 1–2.)  In connection with that meeting, Dr. Williams submitted a letter to the CSE dated June 13, 2012.  (*See generally* Case II Def.'s Ex. 17 (Dr. Williams evaluation).)  In that letter, Dr. Williams indicated that W.E.'s progress in his first year had been "remarkable" and that he attributed W.E.'s progress, "in part, to his placement in a small supportive, residential school environment that suits his educational, medical & special emotional needs."  (*Id.*, at unnumbered 1.)  Characterizing W.E.'s progress as "notable" but "still fragile," he "[did] not recommend any school change of placement for the . . . 2012–2013 school year."  (*Id.*, at unnumbered 2.)  Additionally, Dr. Williams's letter indicated that W.E.'s "GAF score" was approximately a 65, corresponding to "[m]oderately severe impairment," (*see id.* at 2), in contrast to the prior year, when Dr. Williams reported a score of 60, which also indicated "[m]oderately severe impact," (*see* Case II Def.'s Ex. 23 (Letter from Dr. Williams to CSE (August 11, 2011)), at 38), although, when he testified, Dr. Williams noted that, over the prior year, there had been a "change in the psychiatric nomenclature diagnostically so that they have . . . abolished the GAF as part of the formal diagnostic code because . . . it has been difficult to establish a quantifiable, reproducible, objective assessment that is adequately informative," (Case II Hr'g Tr. 1371).  In addition, Dr. Lupiani shared her findings, and Coughlin discussed her observations.  (*See id.* at 163.)

Also at the meeting, Plaintiffs stated that W.E. was experiencing fewer migraines, earning grades in the average range, and was engaged in a variety of outdoor activities.  (*See* Case II Hr'g Tr. 153–55; *see also* Def.'s 56.1 ¶ 138; Pls.' 56.1 ¶ 138.)  Dr. Robins went over the results of a BASC-2 he had conducted in February, which did not show any atypical or clinically significant results, and further advised that W.E. was experiencing fewer migraines and making

progress at Northwood, in contrast to eighth grade when W.E. was "not doing well at all." (*See* Case I Hr'g Tr. 1443–66; *see also* Def.'s 56.1 ¶¶ 137–39; Pls.' 56.1 ¶¶ 137–39; Pls.' Cross 56.1 ¶¶ 538–41; Def.'s Cross 56.1 ¶¶ 538–41.)

Although Plaintiffs disagree in light of their contention that the CSE had not completed its discussion of goals at the meeting, (*see* Pls.' 56.1 ¶¶ 142–44), the record reflects that the CSE made several recommendations for IEP goals, (*see generally* Case II Def.'s Ex. 19 (draft IEP)), specifically, using a planner to keep track of assignments and due dates, (*see* Case II Hr'g Tr. 164–65), consistently handing in completed assignments on time, (*see id.* at 166–67), seeking appropriate assistance from teachers and support staff, (*see id.* at 168), and taking written notes both in class and copied from a chalkboard, (*see id.* at 169–71). Afterward, W.E.'s IEP was finalized, (*compare* Case II Def.'s Ex. 18 (non-draft IEP), *with* Case II Def.'s Ex. 19 (draft IEP)), which recommended a student-teacher ratio of 8:1:1, (*see* Case II Def.'s Ex. 18 (IEP), at 7), and also recommended, consistent with the discussion at the CSE, (*see* Case II Hr'g Tr. 187, 876; *see also* Pls.' Cross 56.1 ¶¶ 568–70; Def.'s Cross 56.1 ¶¶ 568–70), participation in the Southern Westchester BOCES program at Irvington High School's TSP program, (*see* Case II Def.'s Ex. 18 (draft IEP), at 1–2), which M.S. had earlier visited with W.E. on July 20, 2012, although under the impression that it was a BOCES program for gifted students, (*see* Case II Hr'g Tr. 1071–73). Despite this confusion, as Defendant observes, (*see* Def.'s 56.1 ¶ 182; Pls.' 56.1 ¶ 182), M.S., in fact, already had visited the Southern Westchester BOCES Gifted Special Education Program in November 2011 and rejected it in connection with a prior referral, (*see* Case II Def.'s Ex. 35 (Dec. 2011 letter)).[8] The discussion of the TSP program with Dr. Penny

---

[8] Plaintiffs also point to evidence in the record concerning what they take to be Defendant's deficient efforts at placing W.E. in another program. (*See* Pls.' Cross 56.1 ¶¶ 588–89; Def.'s Cross 56.1 ¶¶ 588–89.) This evidence is, however, immaterial to the instant Motions.

Knack ("Dr. Knack"), the BOCES psychologist, led W.E. to be uninterested in the program. (*See* Case II Hr'g Tr. 1071–75; *see also* Pls.' Cross 56.1 ¶¶ 590–96; Def.'s Cross 56.1 ¶¶ 590–96.)

By letter dated July 27, 2012, M.S. informed Coughlin that she did not think the Southern Westchester Therapeutic Support-Fragile Program was an appropriate placement, raised concerns about the program articulated by Drs. Lasser and Robins, and made a variety of other requests, (*see* Case II Def.'s Ex. 26 (July 2012 letter); *see also* Pls.' Cross 56.1 ¶¶ 600, 604, 606, 609–13; Def.'s Cross 56.1 ¶¶ 600, 604, 606, 609–13), although the District formally recommended the program to the Parents by letter dated August 15, 2012, (*see* Case II Def.'s Ex. 28 (letter from District Office of Special Education to Parents (Aug. 15, 2012))).  On August 15, 2012, the CSE also held a meeting, attended by M.S., Coughlin, Dr. Knack, and others.  (*See* Case II Hr'g Tr. 1083–84.)  In advance of that meeting, M.S. requested that her July 27, 2012 letter be distributed.  (*See id.*)  Although Dr. Knack had originally proposed that W.E. not be in fully mainstream courses for at least the first six months, (*see* Case II Hr'g Tr. 1074; Case II Def.'s Ex. 26, at 2), at the CSE meeting, she said that W.E. could take any mainstream class that he wanted at the BOCES, even though mainstream classes do not have a 8:1:1 student to teacher ratio, (*see* Case II Hr'g Tr. 1085–86; *see also* Pls.' Cross 56.1 ¶¶  625–28; Def.'s Cross 56.1 ¶¶ 625–28).  At the meeting, the Parents also shared concerns over the proposed placement.  (*See* Case II Hr'g Tr. 541, 1091–92, 1104; *see also* Pls.' Cross 56.1 ¶¶ 643, 645–46; Def.'s Cross 56.1 ¶¶ 643, 645–46.)  After the meeting, Coughlin edited the IEP to indicate that W.E. would be scheduled for general education classes in math, science, and English.  (*See* Case II Hr'g Tr. 239–41; Case II Def.'s Ex. 18 (IEP), at 10; *see also* Pls.' Cross 56.1 ¶¶ 677–78; Def.'s Cross 56.1 ¶¶ 677–78.)  The Parents received the IEP on September 11, 2012, (*see* Case II Hr'g Tr.

1096), and rejected the IEP in a twelve-page letter to the superintendent dated September 20, 2012, (*see* Case II Pls.' Ex. AA).[9]

### 5.  W.E.'s Sophomore Year

Northwood accepted W.E. for reenrollment for his sophomore year on February 29, 2012, (*see* Case II Def.'s Ex. 33; *see also* Def.'s 56.1 ¶ 155; Pls.' 56.1 ¶ 155); the Parents signed a contract in approximately April 2012, (*see* Case II Hr'g Tr. 1140–41); and W.E. returned to the School for his sophomore year, which again established an accommodation plan and ensured faculty members were aware of and received copies of it, (*see* Case II Pls.' Exs. C, D (accommodation plans); Case II Def.'s Ex. 27 (2012–13 placement rejection); *see also* Pls.' Cross 56.1 ¶¶ 369–70, 382–84; Def.'s Cross 56.1 ¶¶ 369–70, 382–84).  This second official accommodation plan, after some modification, listed seven "educational accommodations" for W.E.'s sophomore year, comprising (1) extended time for in-class assignments, (2) preferential seating, (3) graphic organizers or guided notes to support information presented verbally, (4) individualized/regular counseling sessions with the school counselor, (5) "[a]ssistive technology: iPad for use in class," (6) supervised study hall, and (7) access to a school nurse.  (*See* Case II Pls.' Exs. C, D (accommodation plans); *see also* Pls.' Cross 56.1 ¶¶ 371–73; Def.'s Cross 56.1 ¶¶ 371–73.)

Among the changes made between the two drafts were to add the iPad provision and to add "supervised study hall" as a formal requirement.  (*Compare* Case II Pls.' Ex. C, *with* Case II Pls.' Second Ex. D.)  The inclusion of the iPad requirement, according to M.S., came about after

---

[9] The Parents also stress that they objected to many of the goals in the draft IEP while at the meeting and that they believed they would have an opportunity to revisit the goals before the IEP was finalized.  (*See* Case II Hr'g Tr. 874–75; *see also* Pls.' Cross 56.1 ¶¶ 557–61; Def.'s Cross 56.1 ¶¶ 557–61.)

W.E. had been using an iPad in chemistry "because it was an iPad[-]only course," and it was found that use of the iPad "seemed to be helping him based on what the chemistry teacher had told [her]," (Case II Hr'g Tr. 834), although Spear testified that, generally, all Northwood students have the opportunity to use an iPad in class at Northwood, (*see* Case II Hr'g Tr. 452; *see also* Def.'s 56.1 ¶ 163; Pls.' 56.1 ¶ 163).  There is evidence that the use of the iPad helped W.E. outside of chemistry, too, with his history teacher describing it as "huge" for him in that it was organizationally helpful, (*see* Case II Hr'g Tr. 371, 378, 380–83; *see also* Pls.' Cross 56.1 ¶¶ 377–79; Def.'s Cross 56.1 ¶¶ 377–79), a sentiment echoed by M.S., (*see* Case II Hr'g Tr. 824 (noting W.E.'s use of the iPad for organizational purposes)).  With respect to the supervised study hall, Spear testified that, in addition to the mandatory evening study hall that all students have, W.E. opted to convert one of his free periods into a supervised study hall.  (*See* Case II Hr'g Tr. 441.)  Spear characterized W.E.'s request to participate in this second study hall as a display of "maturity and self-advocacy."  (*Id.* at 442.)

There is also evidence in the record concerning how unique W.E.'s accommodations were at Northwood and the extent to which his teachers were aware of the plan.  The testifying teachers knew of W.E.'s preferential seating requirements, his entitlement to additional time for tests, and his entitlement to a separate, quiet room for tests, although at least one teacher (who also provided guided notes to W.E.) testified that W.E. generally did not remove himself to an independent test room, (*see* Case II Hr'g Tr. 377–79, 381, 619; Pls.' Cross 56.1 ¶¶ 386–87; Def.'s Cross 56.1 ¶¶ 386–87), and that that teacher did not limit test taking time for any of his students, (*see* Case II Hr'g Tr. 619–21; *see also* Def.'s 56.1 ¶ 167; Pls.' 56.1 ¶ 167). Furthermore, Northwood students participate in at least the evening study hall and have access to

nursing services.  (*See* Case II Hr'g Tr. 441, 456–57; *see also* Def.'s 56.1 ¶¶ 164–66; Pls.' 56.1 ¶¶ 164–66.)

Additionally, Mellor testified to continuing counseling with W.E., albeit frequently in an informal sense.  When asked how often Mellor saw W.E. in his role as counselor, Mellor explained that, "if [that question means] how frequently is [W.E.] sitting in [Mellor's] office on a regularly scheduled meeting, not too often."  (Case II Hr'g Tr. 621.)  When asked how Mellor conducted his informal counseling meetings during W.E.'s sophomore year, he testified that, "[m]ost of the time[,] it's down in [W.E.'s] room," and that "[Mellor] just walk[s] in and take[s] a few minutes to shut the door behind [himself] and chat [W.E.] up."  (Case II Hr'g Tr. 624.) When asked whether Mellor "provide[s] regular counseling sessions for [W.E.]," Mellor explained that, "[i]f the definition is an assigned regular [sic] in the office, the answer is no," but that, "[i]f the definition is regular purposeful attentive conversations by [Mellor] to see how [W.E.] is doing and to either coach or prod or ask, then the answer is yes."  (Case II Hr'g Tr. 649.)  When asked whether Mellor engages in "purposeful attentive conversations to gauge how [a student] is doing" for other students, too, Mellor initially said, "[y]es," before adding that "there were students whom [he] [had not] spoken in a month [sic]," so "if [he] [were to] say yes to the word 'all' and then [sic] that's not true," but that it is "the routine of Northwood School and . . . the routine of [Mellor's] job."  (Case II Hr'g Tr. 649.)

Beyond the accommodation plan, in a June 2012 letter to the CSE, copying the Parents, Dr. Williams "advocat[ed] that the supportive, informal counseling that was provided by one of [W.E.'s] teachers during the past academic year[] be supplemented by a more systematic psychotherapy program in the coming year, to more effectively address those areas of continuing vulnerability with which [W.E.] continues to struggle."  (Case II Def.'s Ex. 17 (Dr. Williams

34

evaluation).)  Although the Parents initially "gave [W.E.] the benefit . . . of his preference to not

have the formal counseling," "there were still issues he had to deal with," and, so, in February or

March 2013, a social worker was found for W.E. to see in Mellor's office on a weekly basis, (*see*

Case II Hr'g Tr. 838, 1264–65, 1277).  The Parents handled the paperwork for the social worker

to meet with W.E.  (*See* Case II Hr'g Tr. 1282.)  In addition, the Parents identified Dr. Havlicek

as a possible treating psychologist, but both Mellor and Dr. Williams advised against his

services.  (*See* Case II Hr'g Tr. 628, 840; *see also* Pls.' Cross 56.1 ¶ 405; Def.'s Cross 56.1

¶ 405.)  Moreover, staff from the school informally checked in on W.E. as well: his history and

English teachers stopped in to see how he was doing, (*see* Case II Hr'g Tr. 375–76, 613; *see also*

Pls.' Cross 56.1 ¶¶ 409–10; Def.'s Cross 56.1 ¶¶ 409–10), and, according to one of W.E.'s

teachers, the nurses would try to check up on him as well, (*see* Case II Hr'g Tr. 376–77).

There is also evidence to suggest, by at least some measures, W.E. had a successful

sophomore year.  W.E. took chemistry, algebra II & trigonometry, history, and Spanish II, (Pls.'

Cross 56.1 ¶ 396; Def.'s Cross 56.1 ¶ 396), earning a mix of grades between C+ and A-, (*see*

Case II Pls.' Ex. L (3rd marking period report card)).  Within those classes, however, W.E.'s

performance was uneven, and one of W.E.'s teachers testified that while "[h]is memory is great

for an end of the year review," he "doesn't always keep" "small . . . , potentially insignificant

facts" as needed for a quiz that deals with them.  (Case II Hr'g Tr. 372.)  Another one of his

teachers remarked that he must be in the top six students in a class of 40 or so, (*see id.* at 608–

09), but also commented that W.E. would at times not do homework assignments and would

become disengaged if a particular class did not interest him, (*see id.* at 606–09; *see also* Def.'s

56.1 ¶ 157; Pls.' 56.1 ¶ 157).  The comments on W.E.'s report cards were similarly mixed,

indicating that W.E. showed a lack of engagement at times and that some teachers reported late

and missing assignments, poor quiz grades in English, and occasional inappropriate behavior in class.  (*See* Case II Pls.' Exs. I, J, L (report cards); *see also* Def.'s 56.1 ¶ 158; Pls.' 56.1 ¶ 158.)[10] Regarding extracurricular activities, W.E. participated in an outdoor program in Yellowstone with a group of teenagers, and he also played goalie in soccer, whereas in eighth and ninth grade, he had been unable to play soccer at all.  (*See* Case II Hr'g Tr. 1057; *see also* Pls.' Cross 56.1 ¶ 416; Def.'s Cross 56.1 ¶ 416.)  On a personal level, W.E.'s confidence and comfort continued to grow, with W.E. delivering a presentation in front of the whole school without shyness or difficulty, sharing his opinion in class, and coming to have a good circle of friends.  (*See* Case II Hr'g Tr. 392, 427–28, 430; *see also* Pls.' Cross 56.1 ¶¶ 414–15, 419–20; Def.'s Cross 56.1 ¶¶ 414–15, 419–20.)  In terms of health, W.E. had a particularly severe migraine in May 2013, in connection with which the nurse indicated that W.E. "may have to go home to heal if needed for the week if he [could not] leave his room to attend class, sports[,] and spring program."  (*See* Case II Pls.' Ex. T.)

### 6.  The Doctors' Perspective

There is evidence that various medical professionals regarded Northwood as a good fit or otherwise noted positive changes in W.E. after his freshman and/or sophomore year. Specifically, Dr. Williams testified that the School was appropriate for W.E.'s needs, including his emotional needs, at least as reflected in his dramatic improvement in headache frequency. (*See* Case I Hr'g Tr. 925; *see also* Pls.' Cross 56.1 ¶¶ 430–31; Def.'s Cross 56.1 ¶¶ 430–31.)  Dr. Williams noted that he estimated that W.E. likely had a GAF score around 70, although subject

---

[10] Plaintiffs argue that Defendant's assertion does not provide appropriate context, as, they say, W.E.'s first-quarter report card for English indicated that W.E.'s ability to think critically put him at the top of the class.  (*See* Pls.' 56.1 ¶ 158.)  That quote, however, is actually from the previous year's fourth-quarter report card.  (*See* Case II Pls.' Ex. H.)

to the caveat that the GAF had been abolished as part of the formal diagnostic code.  (*See* Case II Hr'g Tr. 1371.)  Moreover, Dr. Robins testified that the School was a "sort of treasure chest," uniquely suited to W.E.'s needs, and further positively noted its close association to a camp and that W.E. picked it.  (*See* Case I Hr'g Tr. 1043–44, 1059, 1063–64; Case II Hr'g Tr. 944–46; *see also* Pls.' Cross 56.1 ¶¶ 432–37; Def.'s Cross 56.1 ¶¶ 432–37.)  The School's size also helped, Dr. Robins indicated, inasmuch as a smaller school would enable W.E.'s teachers to get to know him better and would allow W.E. to feel more comfortable.  (*See* Case I Hr'g Tr. 1042, 1056; *see also* Pls.' Cross 56.1 ¶¶ 453, 455; Def.'s Cross 56.1 ¶¶ 453, 455.)  Similarly, Dr. Robins believed that it was important to break up W.E.'s time, allowing for physical activities between class work and studying, (*see* Case II Hr'g Tr. 966; *see also* Pls.' Cross 56.1 ¶ 460; Def.'s Cross 56.1 ¶ 460), and, indeed, that factors such as the structure provided throughout the day prompted positive changes in W.E, (*see* Case II Hr'g Tr. 946).  Likewise, Dr. Robins attributed W.E.'s improved BASC-2 scores to Northwood and testified to his view that W.E. was in better mental health, more engaged in school, and felt as though he was not quite as hopeless as in the past.  (*See* Case I Hr'g Tr. 1453, 1462, 1464–66; *see also* Pls.' Cross 56.1 ¶¶ 440–44; Def.'s Cross 56.1 ¶¶ 440–44.)  Dr. Robins further testified that he did not believe a day program would provide the same benefit as the boarding aspect of the program, (*see* Case II Hr'g Tr. 951), and, according to M.S., having W.E. in a "seamless educational environment where there wouldn't be a distinction between home and school" was educationally necessary, so that the experience of having a migraine would not prevent him from having to go out into the world, (*see* Case II Hr'g Tr. 841–42).  Similarly, Dr. Marian Rissenberg ("Dr. Rissenberg"), who did an independent evaluation of W.E., believed the boarding school aspect helped, (*see* Case II Hr'g Tr. 1288, 1321–22; *see also* Pls.' Cross 56.1 ¶ 466; Def.'s Cross 56.1 ¶ 466), and Dr. Williams explained

that when W.E. was kept home from school by a parent, W.E. began to recognize his migraine

symptoms as an escape from the stress he experienced at school or elsewhere, (*see* Case I Hr'g

Tr. 893–94; *see also* Pls.' Cross 56.1 ¶ 448; Def.'s Cross 56.1 ¶ 448), and a boarding school

would "enable him to be more suitably supported away from . . . the stresses he encountered in

the cycle at home," (Case I Hr'g Tr. 923).

B.  Administrative Proceedings

This case stems from two separate due process complaints brought by Plaintiffs, one

relating to the 2010–11 and 2011–12 school years ("Case I"), and the other relating to the 2012–

13 school year ("Case II").

1.  Case I

a.  Child Find and FAPE Denial for 2010–11

The first IHO found that Defendant denied W.E. a free and appropriate public education

("FAPE") by failing to identify W.E. as a student suspected of having a disability, failing to

evaluate him as a consequence of that obligation, and failing to classify him as a student with a

disability and develop an appropriate IEP.  (Case I IHO Op. at unnumbered 21.)[11]  According to

the IHO, "[b]y January 3 of the 2010–2011 school year[,] the District had sufficient information

to suspect that the student had a disability and to trigger its child find obligation."  (*Id.* at

unnumbered 22.)  As the IHO explained, "[b]y January 3, 2011, the District was or should have

been aware that by June 14, 2010, the student had missed approximately 30 days of school in the

seventh grade," and that "[t]he same pattern emerged in the eighth grade with the student missing

---

[11] The Case I IHO Opinion does not have page numbers.  When the Court refers to a particular page of the IHO Opinion, it starts counting from the page labeled "Hearing Officer's Findings of Fact and Decision W.A.W. and M.W. v. Hendrick Hudson School District," followed by an "Introduction" header.

approximately 27 days from September to December," which, in connection with Defendant's or its employees' knowledge of the W.E.'s headaches and medication, organization issues, mediocre ratings relating to behavioral adjustment and relationships, and absences, as well as M.S.'s decision to reach out to Dr. Brodsky in December 2010, "should have given rise to a suspicion that the student was a child with a disability." (*Id.* at unnumbered 22–23.) Given the information that Defendant had, the IHO concluded that rather than cancel the January 5, 2011 Section 504 meeting, Defendant should have "reviewed the reports completed by the teachers in preparation for that meeting . . . , considered all of the information it had in its possession, made a referral to the CSE, and ask[ed] the parent for consent to evaluate the student." (*Id.* at unnumbered 24.) Because it did not, "[t]he District's failure to classify the student or provide him with services in the required time frame was a denial of FAPE." (*Id.*)

Having found a FAPE denial, the IHO went on to consider the appropriate remedy. Although Plaintiffs had requested 200 hours of compensatory education services, 20 hours of compensatory counseling, and reimbursement of counseling services provided by Dr. Robins and Dr. Williams, the IHO awarded reimbursement for the sessions with Dr. Williams that he used to prepare his diagnostic evaluation, five sessions with Dr. Robins given W.E.'s need for school-based counseling services, and 15 additional hours of counseling, but denied Plaintiffs' request for 200 hours of home instruction, reasoning that "the parent [did] not offer[] any evidence that the student [was] in need of academic remediation." (*See id.* at unnumbered 24–25.)

On appeal, the SRO disagreed with the IHO's child-find determination. Reasoning that "[a] district's child find duty is triggered when there is reason to suspect a disability *and* reason to suspect that special education services may be needed to address that disability," (Case I SRO Op. 14 (internal quotation marks omitted)), the SRO reviewed the relevant materials in the

record, including the Parents' communications with district personnel, the implementation of

W.E.'s June 2010 Section 504 accommodation plan, W.E.'s academic performance, and the

testimony of persons from the School familiar with W.E.  (*See id.* at 15–18.)  Having done so,

the SRO concluded that

> [b]ased upon the evidence contained in the hearing record as discussed above, I
> find that despite the student's recurring headaches and resulting absences during
> the 2010–11 school year, the hearing record supports a finding that the even [sic] if
> the [D]istrict had reason to suspect that the student had a disability, the [D]istrict
> had no reason to suspect that the student required special education to address such
> disability prior to April 2011 because the student progressed very well in the
> general education curriculum with the accommodations provided by the [D]istrict
> in its June 2010 section 504 plan.

(*Id.* at 18 (citations omitted).)  The SRO also disagreed with the IHO that the May 25, 2010

psychoeducational evaluation report gave the District reason to suspect that W.E. required

special education services to address a disability.  (*See id.* at 18–20.)  The SRO then went on to

affirm the IHO's determination that the Parents' claim for 200 hours of compensatory home

instruction should be denied, reasoning that, under state regulations, "the [D]istrict was not

required to arrange for the appropriate special education programs and services to be provided to

the student until 60 school days after receiving consent to evaluate the student, which, in this

case, expired after the 2010–11 school year ended."  (*Id.* at 23.)  Nevertheless, the SRO did not

consider the IHO's award of reimbursement for sessions with W.E.'s clinical psychologist and

15 hours of compensatory counseling services for W.E., finding that relief unappealed.  (*See id.*

at 13.)

### b.  Timing and Development of the IEP for 2011–12

The IHO next found that "[t]he District violated significant procedural requirements

depriving the student of a FAPE," inasmuch as it did not make a determination to classify W.E.

until August 26, 2011, over 130 days after the Parents referred W.E. and provided signed

40

consent, when the regulations provide for a 60-day window.  (Case I IHO Op. at unnumbered 26.)  The IHO concluded that "[g]iven the difficulty [M.S.] was having in bringing the student to Dr. Hahn, if the District thought that the evaluation was critical to reaching a CSE determination, the District had the affirmative obligation to get the evaluation conducted even if it meant sending a psychiatrist to the student's home."  (*Id.* at unnumbered 27.)  The District's failure to make a timely evaluation and recommendation, according to the IHO, significantly delayed consideration of W.E.'s classification and development of his IEP, resulting in a denial of a FAPE.  (*Id.*)[12]

The SRO agreed that the District denied W.E. a FAPE for the 2011–12 school year.  The SRO explained that "[a]t the beginning of each school year, a school district is required to have an IEP in effect for each child with a disability in its jurisdiction," but that, "[i]n this case, the hearing record demonstrates that the [D]istrict failed to have a finalized IEP in place for the student at the start of the 2011–12 school year, in contravention of the IDEA and federal regulations," thereby denying W.E. a FAPE.  (Case I SRO Op. 24 (alterations omitted).)

---

[12] The IHO also concluded that the CSE's lack of a special education and regular education teacher familiar with W.E. denied him a FAPE, although the lack of an additional parent member did not.  (*See* Case I IHO Op. at unnumbered 27 –29.)  The SRO recognized that, although the Parents "amended their due process complaint notice to interpose a claim regarding CSE composition, they alleged in that claim only that the August 2011 CSE was improperly constituted because it lacked an additional parent member," and that "the amended due process complaint notice [was] bereft of any allegations regarding the composition of the May 2011 CSE or the regular education or special education teachers who participated in either the May 2011 or August 2011 CSE meetings."  (Case I SRO Op. 12.)  As a result, the SRO determined that "the IHO should have confined her determination to the issues raised in the [P]arents' January 25, 2012 amended due process complaint notice."  (*Id.*)  Similarly, Plaintiffs point to evidence in the record relating to the timing and composition of the CSE.  (*See* Pls.' Cross 56.1 ¶¶ 489–94.)  However, because Defendant does not challenge the finding that it failed to provide a FAPE for this year, there is no need to examine the question in that level of detail.  The same is true for the evidence that Plaintiffs cite about the composition of the 2012 CSE.  (*See* Pls.' Cross 56.1 ¶¶ 533–36, 615–16.)

<u>c.  Whether Northwood Was an Appropriate Placement</u>

Notwithstanding the IHO's conclusion that the District denied W.E. a FAPE for the

2011–12 school year, she found that "the [P]arents [did] not [meet] their burden of

demonstrating that Northwood provided educational instruction specially designed to meet

[W.E.'s] identified special education needs during the 2011–2012 school year," and that, "[a]s a

result, the program cannot be found to be appropriate for the student under the [IDEA]," and,

"[w]hile the [P]arents determined that Northwood was the right school for [W.E.] to address his

needs, and made this decision as loving and responsible parents, the District is not responsible

for reimbursing the parents for this type of program."  (Case I IHO Op. at unnumbered 35–36.)

The IHO arrived at this conclusion by considering testimony concerning W.E.'s condition and

needs as well as testimony about Northwood, its programs, and W.E.'s progress there, but noting

that there was no evidence that the emotional issues underlying W.E.'s migraines had been dealt

with or that W.E.'s issues pertaining to organization issues and study skills were being dealt

with.  (*See id.* at unnumbered 29–36.)  As a result, the IHO denied the Parents' request for tuition

reimbursement.  (*See id.* at numbered 37–38.)

In its decision, the SRO concluded that "the [P]arents did not establish that [Northwood]

was an appropriate placement for the student for the 2011–12 school year, and that the IHO's

determination was correct."  (*See* Case I SRO Op. 24–31.)[13]

---

[13] Because the SRO determined that Northwood was not an appropriate placement, it
declined to consider whether the equities favored reimbursement.  (*See* Case I SRO Op. 31–32.)

### 2.  Case II

#### a.  Whether the District Provided W.E. a FAPE

In the second case dealing with W.E.'s sophomore year, the IHO concluded that the District denied W.E. a FAPE, including inasmuch as W.E.'s IEP called for an 8:1:1 class size and also mainstreaming in Math, English, and science classes, even though general education classes have a student-to-teacher ratio of 24:1.  (*See* Case II IHO Op. 9–12.)[14]  On appeal, the SRO concluded that, "based on the failure of the August 2012 IEP to indicate how the student would simultaneously attend an 8:1+1 special class placement while enrolled in mainstream classes, the hearing record supports the IHO's conclusion that the IEP was internally inconsistent."  (Case II SRO Op. 13.)

#### b.  Whether Northwood Was an Appropriate Placement

In contrast with the first IHO and both SRO decisions, the second IHO determined that Northwood *was* an appropriate placement.  (*See* Case II IHO Op. 14–19.)  In particular, the IHO found that the School's educational instruction was "specially designed to meet [W.E.'s] needs," as demonstrated by its small class sizes, its environment (specifically, its "integration between . . . home life and education," social context, and physical location), the School's accommodation plan for W.E., and the School's counseling and nursing services.  (*See id.*)

---

[14] The Parents asserted seven issues before the IHO, three procedural and four substantive.  The procedural issues were (1) "[a] direct conflict between the IEP student/teacher ratio and the proposed placement of [W.E.] in mainstream classes," (2) that "[t]he CSE failed to include [W.E.'s] regular education teacher or special education teacher in the relevant CSE meetings," and (3) "[t]hat the District failed to disclose documents in a timely fashion and the CSE did not consider select information," and that, "[s]pecifically, the District Psychologist did not speak to anyone who knew [W.E.] in preparation for the CSE meetings and did not distribute the updated BASC-II protocols despite the timely parental request."  (Case II IHO Op. 6–7.)  The IHO found it unnecessary to consider the substantive issues in light of its determination as to the procedural issues.  (*See id.* at 13–14.)

The SRO, however, disagreed.  Specifically, the SRO considered the May 11, 2012 psychologist report based on the BASC-2 rating scales, Coughlin's observation of W.E., W.E.'s grades and teacher feedback, Dr. Williams's June 13, 2012 letter, and W.E.'s August 2012 IEP. (*See* Second SRO Op. 14–17.)  From there, the SRO described Northwood and the various features of its accommodation plan, (*see id.* at 17–20), before discussing Northwood's small class sizes, its nature as a boarding school, and its emphasis on outdoor activities, (*see id.* at 21–25).  Although the SRO concluded that it was "without question" that W.E. "exhibited progress" during the 2012–13 school year "in the sense that[,] except when experiencing a migraine, he attended classes consistently, achieved grades in the "A-" to "C+" range, and demonstrated increased maturity and ability to socially interact with peers while attending [Northwood]," the hearing record nevertheless failed to "contain evidence that [Northwood] provided [W.E.] with specially designed instruction to meet his ongoing need to develop insight and understanding into what triggered his stress and anxiety, and positive coping skills to address stress and decrease anxiety."  (*Id.* at 23.)  The SRO found this important because, as he noted, the Parents identified for Northwood as a goal that W.E. "'understand and identify the factors leading to stress and express such factors and feelings, rather than internalizing and somatizing stress,' noting that the goal would be achieved during continued meetings with the counselor," but "the hearing record is devoid of information such as counseling notes, progress reports toward goals, etc., showing how, if at all, these sessions addressed [W.E.'s] need to develop insight and coping skills."  (*Id.*)  Additionally, the SRO noted W.E.'s "continued . . . organizational and motivational/behavioral difficulties at times in class," and found that, despite the Parents' identification of goals for W.E., the hearing record did not include information concerning how Northwood addressed W.E.'s needs, apart from the accommodations "which . . . were available

to most if not all [Northwood] students." (*Id.* at 24.)  Consequently, the SRO "[found] that the [P]arents did not establish that [Northwood] was an appropriate placement for [W.E.] for the 2012–13 school year, and that the IHO's determination must be overturned." (*Id.* at 25.)

    C.  Procedural Background

    On April 30, 2014, Plaintiffs filed their complaint concerning the 2010–11 and 2011–12 school years in case number.  (*See* Dkt. No. 2 (14-CV-3067 Dkt.).)  On June 18, 2014, the District submitted its Answer in that case.  (*See* Dkt. No. 4 (14-CV-3067 Dkt.).)  Additionally, on June 13, 2014, Plaintiffs filed another lawsuit relating to the 2012–13 school year.  (*See* Dkt. No. 2 (14-CV-4285 Dkt.).)[15]  Defendant submitted its Answer on August 4, 2014.  (*See* Dkt. No. 5 (14-CV-4285 Dkt.).)

    On December 9, 2014, the Court held an initial conference, (*see* Dkt. (minute entry for Dec. 9, 2014) (14-CV-3067 Dkt.)), and issued a scheduling order for motions, (*see* Dkt. No. 10 (14-CV-3067 Dkt.); Dkt. No. 13 (14-CV-4285 Dkt.)).  On December 19, 2014, Plaintiffs submitted a letter requesting that the Court order the Parties to participate in mediation, (*see* Dkt. No. 11 (14-CV-3067 Dkt.); Dkt. No. 14 (14-CV-4285 Dkt.)), an order the Court declined to enter, (*see* Dkt. No. 12 (14-CV-3067 Dkt.); Dkt. No. 15 (14-CV-4285 Dkt.)).  On January 23, 2015, Plaintiffs submitted a letter in advance of their intended Motion pursuant to Federal Rule of Civil Procedure 54 for the Court to enter partial judgment in the amount of $8,600 for that portion of the IHO's ruling in the first case that the SRO had determined was not appealed.  (*See* Dkt. No. 13 (14-CV-3067 Dkt.)  The District responded on January 28, 2015, (*see* Dkt. No. 14

---

    [15] Plaintiffs also filed two other actions, the procedural history of which will not be set forth herein: (1) 14-CV-8093, alleging various constitutional violations pursuant to 42 U.S.C. § 1983 as well as claims under New York law, and (2) 16-CV-2954, relating to school years beyond those presented in this case.

(14-CV-3067 Dkt.)), and Plaintiff submitted a supplemental letter in support of its request on January 29, 2015, (*see* Dkt. No. 15 (14-CV-3067 Dkt.)).  The Court thereafter held a conference on March 3, 2015.  (*See* Dkt. (minute entry for Mar. 3, 2015) (14-CV-3067 Dkt.).)  On September 24, 2015, the two pending IDEA cases—i.e., 14-CV-3067 and 14-CV-4285—were consolidated into 14-CV-3607.  (*See* Dkt. No. 26 (14-CV-3067 Dkt.); Dkt. No. 24 (14-CV-4285 Dkt.).)  On October 21, 2015, Plaintiffs submitted a letter to the Court requesting the administrative record be filed under seal, (*see* Dkt. No. 28), and, after the Court ordered counsel to address the feasibility of redacting certain documents, (*see* Dkt. No. 29), Plaintiffs filed a second letter expounding on their request to file the record under seal, (*see* Dkt. No. 30).  On November 3, 2015, the Court granted Plaintiffs' request to file the administrative record under seal.  (*See* Dkt. No. 31.)

After several time extensions, on December 3, 2015, Defendant filed its Motion for Summary Judgment and to Amend Its Answer, along with accompanying papers, (*see* Dkt. Nos. 32–36); Plaintiffs filed their Cross Motion for Summary Judgment and Opposition to Defendant's Motion, (*see* Dkt. Nos. 37–41); Defendant filed its Opposition to Plaintiffs' Motion and Reply in support of its Motion, (*see* Dkt. Nos. 42–44); and Plaintiffs filed their Reply in support of their Cross-Motion, (*see* Dkt. Nos. 45–46).

## II.  Discussion

### A.  Statutory Background

"The IDEA's purpose is 'to ensure that all children with disabilities have available to them a free appropriate public education,'" which, "[i]n practice, . . . means that [s]tates have an affirmative obligation to provide a basic floor of opportunity for all children with disabilities." *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quoting 20 U.S.C.

§ 1400(d)(1)(A)).  To that end, the IDEA requires that "states receiving federal funds . . . provide 'all children with disabilities' a 'free appropriate public education.'"  *Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014) (quoting 20 U.S.C. § 1412(a)(1)(A)).  A school district within such a state provides a FAPE when it offers "special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits."  *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 238–39 (2d Cir. 2015) (internal quotation marks omitted).  At its core, the statute ensures an "appropriate" education, but "not one that provides everything that might be thought desirable by loving parents."  *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) (internal quotation marks omitted).

"To ensure that qualifying children receive a FAPE, a school district must create an [IEP] for each such child."  *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  "Under New York law, local [CSEs] are responsible for developing appropriate IEPs."  *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 214–15 (2d Cir. 2014) (citing N.Y. Educ. Law § 4402(1)(b)(1)).  "The IEP is a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *M.O.*, 793 F.3d at 239 (internal quotation marks omitted); *see also* 20 U.S.C. § 1414(d)(1)(A)–(B), (d)(3) (setting out requirements for IEPs and their development).  "The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP," *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012); however, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an

opportunity greater than mere 'trivial advancement,'" *Cerra v. Pawling Cent. Sch. Dist.*, 427

F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130).  Indeed, the IDEA does not

require schools to "maximize the potential" of students with disabilities, but instead was intended

"more to open the door of public education to handicapped children on appropriate terms than to

guarantee any particular level of education once inside."  *M.H.*, 685 F.3d at 245 (internal

quotation marks omitted).

       In New York, if a parent disagrees with an IEP prepared by a school district, the parent

may challenge the IEP by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f),

before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a).  The IHO's

decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and

the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C.

§ 1415(i)(2)(A); *see also M.H.*, 685 F.3d at 224–26 (generally describing the IHO and SRO

process).

       B.  Standard of Review

       Unlike with an ordinary summary judgment motion, the existence of a disputed issue of

material fact will not necessarily defeat a motion for summary judgment in the IDEA context.

*See, e.g.*, *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir.

2009) (per curiam); *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y.

2006).  Instead, summary judgment in IDEA cases is "in substance an appeal from an

administrative determination, not a summary judgment."  *Lillbask ex rel. Mauclaire v. State of

Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted).

       This posture means that this Court owes "a significant degree of deference to the state

educational agency, as [it is] essentially acting in an administrative-law-style capacity."  *P. ex*

*rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir. 2008).  The Court must

"give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally

'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult

questions of educational policy.'"  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113

(2d Cir. 2007) (second alteration in original) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206,

208 (1982)); *see also Cerra*, 427 F.3d at 191 (noting that the "IDEA's statutory scheme requires

substantial deference to state administrative bodies on matters of educational policy").  While a

reviewing court must "engage in an independent review of the administrative record and make a

determination based on a preponderance of the evidence," *M.H.*, 685 F.3d at 240 (internal

quotation marks omitted), such review "is by no means an invitation to the courts to substitute

their own notions of sound educational policy for those of the school authorities which they

review," *Rowley*, 458 U.S. at 206.  Rather, the standard for reviewing administrative

determinations "requires a more critical appraisal of the agency determination than clear-error

review but nevertheless falls well short of complete de novo review.  In the course of this

oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely

to tell the tale."  *M.H.*, 685 F.3d at 244 (alterations in original) (alterations, italics, and internal

quotation marks omitted).

　　　"Deference is particularly appropriate when the state hearing officers' review has been

thorough and careful."  *P. ex rel. Mr. & Mrs. P.*, 546 F.3d at 118 (alteration and internal

quotation marks omitted).  Specifically,

> the deference owed to an SRO's decision depends on the quality of that opinion.
> Reviewing courts must look to the factors that "normally determine whether any
> particular judgment is persuasive, for example, whether the decision being
> reviewed is well-reasoned, and whether it was based on substantially greater
> familiarity with the evidence and the witnesses than the reviewing court."

*R.E.*, 694 F.3d at 189 (quoting *M.H.*, 685 F.3d at 244); *see also M.H.*, 685 F.3d at 241 ("The

SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant

deference." (quoting *Gagliardo*, 489 F.3d at 114)).  Additionally, the Second Circuit has

instructed courts that deference to an SRO's decision is more appropriate when the substantive

adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the decision

involves a dispute over an appropriate educational methodology versus determinations regarding

objective indications of progress; and when the district court's decision is based solely on the

administrative record that was before the SRO.  *M.H.*, 685 F.3d at 244.

 "Deference is especially appropriate . . . where the SRO Decision agreed with the ruling

of the IHO."  *A.A. v. N.Y.C. Dep't of Educ.*, No. 14-CV-8483, 2015 WL 10793404, at *10

(S.D.N.Y. Aug. 24, 2015); *see also M.T. v. N.Y.C. Dep't of Educ.*, No. 14-CV-10124, 2016 WL

1267794, at *5 (S.D.N.Y. Mar. 29, 2016) ("[D]istrict courts give more deference to

administrative proceedings when the IHO and SRO are in agreement."); *J.D. ex rel. A.P. v.

N.Y.C. Dep't of Educ.*, No. 14-CV-9424, 2015 WL 7288647, at *12 (S.D.N.Y. Nov. 17, 2015)

("[D]eference is particularly apt where the IHO and SRO decisions are in agreement and are

based on the same record as that before the district court . . . ." (internal quotation marks

omitted)), *appeal filed*, No. 15-4050 (2d Cir. Dec. 16, 2015); *A.M. ex rel. Y.N. v. N.Y.C. Dep't of

Educ.*, 964 F. Supp. 2d 270, 285 (S.D.N.Y. 2013) (finding deference "especially appropriate" as

to issue upon which SRO and IHO agreed).  Conversely, "in situations when an SRO reverses

the finding of an IHO, the court should give substantial deference to the SRO's views of

educational policy, but less to the SRO's factual findings or to its reasoning in general."  *S.C. v.

Katonah-Lewisboro Cent. Sch. Dist.*, — F. Supp. 3d —, 2016 WL 1267802, at *11 (S.D.N.Y.

Mar. 30, 2016) (internal quotation marks omitted); *Scott ex rel. C.S. v. N.Y.C. Dep't of Educ.*, 6

F. Supp. 3d 424, 441 (S.D.N.Y. 2014) (same).  Furthermore, in such circumstances, "reviewing

courts are not entitled to adopt the conclusions of either state reviewer according to their own

policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the

SRO as the final state administrative determination."  *Id.* at 246; *see also A.C. ex rel. M.C.*, 553

F.3d at 171 (noting that "if the SRO's decision conflicts with the earlier decision of the IHO, the

IHO's decision may be afforded diminished weight," because the court must "defer to the final

decision of the state authorities" (internal quotation marks omitted)).  However, if the Court

concludes that

> the SRO's determinations are insufficiently reasoned to merit . . . deference, and in
> particular where the SRO rejects a more thorough and carefully considered decision
> of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's
> conclusions unpersuasive even after appropriate deference is paid, to consider the
> IHO's analysis.

*M.H.*, 685 F.3d at 246.  Therefore, this Court "must defer to the SRO's decision on matters

requiring educational expertise unless it concludes that the decision was inadequately reasoned,

in which case a better-reasoned IHO opinion may be considered instead."  *R.E.*, 694 F.3d at 189;

*see also C.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, at *5 (S.D.N.Y. Jan.

3, 2013) ("[T]he Second Circuit [has] explained that the deference owed to an SRO's decision

depends on the quality of that opinion, or its persuasiveness." (citation and internal quotation

marks omitted)), *aff'd*, 552 F. App'x. 81 (2d Cir. 2014).

    C.  Analysis

        1.  The District's Child Find Obligation for the 2010–11 School Year

    Under the IDEA, each state receiving federal funds must "ha[ve] in effect policies and

procedures," 20 U.S.C. § 1412(a), by which it will identify, locate, and evaluate "[a]ll children

with disabilities residing in the state" to determine whether these children require special

education and related services. *Id.* § 1412(a)(3)(A); *see also Handberry v. Thompson*, 446 F.3d

335, 347 (2d Cir. 2006); *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221,

224 (D. Conn. 2008) (describing "child find" obligations), *aff'd*, 370 F. App'x 202 (2d Cir.

2010). This "child find" obligation extends to children "who are suspected of being a child with

a disability . . . and in need of special education, even though they are advancing from grade to

grade . . . ." 34 C.F.R. § 300.111(c)(1); *see also Bd. of Educ. v. L.M.*, 478 F.3d 307, 313 (6th

Cir. 2007) (noting that § 300.111(c) extends the IDEA's "child find" requirement to children

"only suspected of having a disability"); *Dean v. Sch. Dist. of Niagara Falls*, 615 F. Supp. 2d 63,

71 (W.D.N.Y. 2009) (same); *A.P.*, 572 F. Supp. 2d at 224–25 (same). "When a school board

violates its Child Find obligation by not evaluating a child suspected of being disabled, it

necessarily fails to provide that student a FAPE." *Greenwich Bd. of Educ. v. G.M.*, No. 13-CV-

235, 2016 WL 3512120, at *8 (D. Conn. June 22, 2016). "Courts have held that a state's child

find duty is triggered when it has reason to suspect that special education services may be needed

to address the disability." *R.E. v. Brewster Cent. Sch. Dist.*, — F. Supp. 3d —, 2016 WL

2606535, at *5 (S.D.N.Y. Mar. 30, 2016) (alterations and internal quotation marks omitted); *see

also J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 660 (S.D.N.Y. 2011)

("[C]ourts have held that a state's child find duty is triggered when it has a reason to suspect a

disability, and reason to suspect that special education services may be needed to address that

disability." (internal quotation marks omitted)); *New Paltz Cent. Sch. Dist. v. St. Pierre ex rel.

M.S.*, 307 F. Supp. 2d 394, 401 (N.D.N.Y. 2004) (concluding that a child-find obligation is

"triggered when the state has reason to suspect a disability, and reason to suspect that special

education services may be needed to address that disability" (alterations and internal quotation

marks omitted)). "However, the IDEA is not an absolute liability statute and the 'Child Find'

provision does not ensure that every child with a disability will be found." *A.P. ex rel. Powers*, 572 F. Supp. 2d at 225; *see also R.E.*, 2016 WL 2606535, at *3 (same); *J.S.*, 826 F. Supp. 2d at 660 (same).

According to Plaintiffs, "[t]he SRO's determination that the District did not violate its Child Find obligation rest[ed] on an inaccurate perception of the underlying facts and repeatedly disregard[ed] relevant facts," because "[t]he District possessed sufficient knowledge of the need for special education support as early as May 2010." (Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pls.' Cross-Mot. for Summ. J. ("Pls.' Mem.") 5–6 (Dkt. No. 38).) To that end, Plaintiffs marshal W.E.'s seventh-grade test results that show "clinically significant" somatization scores, (*see* Case I Joint Ex. 4), the fact that W.E. dropped English in seventh grade, (*see* Case I Hr'g Tr. 1681), the incompletes or medicals that W.E. received during the second quarter, (*see* Case I Joint Ex. 70), the advice that W.E. drop French and his performance in that class, (*see* Case I Joint Ex. 18; Case I Pls.' Exs. AA, DD), and W.E.'s teachers' view that W.E.'s homework would be submitted, at best, in piecemeal fashion, (*see generally* Pls.' Mem. 6–7). Such facts, in Plaintiffs' view, undercut the SRO's conclusion that "the [D]istrict had no reason to suspect that [W.E.] required special education to address [his] disability prior to April 2011 because [W.E.] progressed very well in the general education curriculum with the accommodations provided by the [D]istrict in its June 2010 section 504 plan." (Case I SRO Op. 18.) To the contrary, Plaintiffs contend, "[b]eyond work being sent home, [W.E.] received nothing from the plan," inasmuch as extended time to turn in assignments was "meaningless" because W.E. was not turning in most assignments by that time, and as W.E. did not receive the two hours of home tutoring called for in the Section 504 plan and the District failed to provide a new tutor until April. (Pls.' Mem. 7.) These details, coupled with M.S. informing the District in

December 2010 that W.E. was in "crisis," (*id.* (citing Case I Hr'g Tr. 1682; Case I Joint Ex. 17)),

"should have prompted someone at the District to suspect that this student . . . might be a student

with a disability in need of special education," (Pls.' Mem. 7 (emphasis omitted)).

The crux of the SRO's decision, however, was not so much that there was no basis to

suspect that W.E. may be disabled, but that there was no reason to suspect that *special education*

was needed to remedy that disability.  (*See* Case I SRO Op. 18 (concluding that "even if the

[D]istrict had reason to suspect that the student had a disability, the [D]istrict had no reason to

suspect that the student required special education prior to April 2011 . . . .").)  The SRO so

concluded because, in its view, "the student progressed very well in the general education

curriculum with the accommodations provided by the [D]istrict in its June 2010 section 504

plan."  (*Id.*)  In reaching that conclusion, the SRO was plainly aware of the Parents'

communications with District personnel in winter 2010 into spring 2011.  (*See* Case I SRO Op.

15.)  The SRO specifically considered M.S.'s December 2010 and early January 2011

cancelation of a psychological evaluation and a Section 504 meeting, as well as testimony about

W.E.'s home tutoring and/or functioning at school from W.E.'s counselors, his pediatric

neurologist, and private psychologist, and, from M.S., about W.E.'s efforts to attend school,

W.E.'s grades, feedback from teachers, and performance on standardized tests.  (*See id.* at 16–

18.).  The SRO also considered W.E.'s May 25, 2010 performance on the WJ-III COG, WJ-III

ACH, and BASC-2.  In so doing, the SRO concluded that "the hearing record d[id] not support

the IHO's finding that the [D]istrict had sufficient reason to believe that the student had a

disability requiring special education and related services prior to the parents' referral of the

student to the CSE for evaluation in April 2011."  (*Id.* at 20.)

With that in mind, the Court sees no reason to disturb the SRO's reasoned analysis. To be sure, this Court is not in the business of forming and then deploying "[its] own notions of sound educational policy," *Rowley*, 458 U.S. at 206, nor, conversely, is it willing to simply "rubber stamp administrative decisions," *Walczak*, 142 F.3d at 129. Rather, the Court has scrutinized the reasoning of the SRO's decision, *cf. R.E.*, 694 F.3d at 189 ("[A] court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned . . . ."), and, in so doing, concludes that the SRO's determination that "even if the [D]istrict had reason to suspect that the student had a disability, the [D]istrict had no reason to suspect that the student required *special education* prior to April 2011," (Case I SRO Op. 18 (emphasis added)), is sensible and supported by the record. This conclusion is particularly logical if, as the SRO's Opinion indicates, "a student's failure to perform in school because of absence from school does not by itself constitute a basis to suspect that the student has a disability," (*id.* at 15), which itself makes sense in light of the law in the Second Circuit that "[t]he IDEA's child find provisions do not require districts to evaluate as potentially 'disabled' any child who is having academic difficulties," *J.S.*, 826 F. Supp. 2d at 663. Moreover, the SRO's conclusion here was sufficiently undergirded by many supporting facts, including W.E.'s receipt of grades in the A or B range, (*see* Case I Hr'g Tr. 1198–200; *see also* Def.'s 56.1 ¶ 7; Pls.' 56.1 ¶ 7), and positive feedback from teachers, (*see* Case I Joint Ex. 70 (8th Grade Report Card)). Although the IHO also provided a detailed recitation of many of W.E.'s difficulties in seventh grade, it is not immediately obvious to this Court—which, in fairness, lacks the requisite "specialized knowledge and educational expertise," *M.W.*, 725 F.3d at 138—how these facts show the District "ha[d] reason to suspect" not just that W.E. was disabled, but "that *special education services* may [have] be[en] needed to address the

55

disability," *R.E.*, 2016 WL 2606535, at *5 (alteration omitted).  To the contrary, if anything, the IHO's opinion looks to elide the distinction between these concepts, positing instead that, by January 3, 2011, "the [Section 504] plan was not succeeding in getting [W.E.] to school and the District had an obligation to identify the student, evaluate him[,] and learn why," (Case I IHO Op. at unnumbered 23), a proposition from which the conclusion seems to follow that, whatever the "why," the rehabilitative "how" was special education.  Therefore, the Court thinks the SRO's decision stood on more solid conceptual footing than the IHO's.

Before formally endorsing the former, however, consideration of the Plaintiffs' critique of the SRO's opinion is in order.  Plaintiffs contend that W.E.'s "academic collapse began in November 2010, not April 2011, as the SRO theorized," inasmuch as the District admitted that Plaintiff received medicals in all but two classes during the final three quarters and, as Coughlin testified, had several "good strong weeks" at the start of the school year before "things dropped off tremendously."  (Pls.' Mem. 8 (quoting Case I Hr'g Tr. 257–58).)  However, the SRO's opinion did not construe academic success as narrowly as Plaintiffs do, instead considering W.E.'s feedback from teachers and standardized test scores as well.  (*See* Case I SRO Op. 17 (citing, inter alia, Case I Joint Ex. 70; Case I Pls.' Exs. CC–GG; Case I Def.'s Ex. 32).)  This is not a defect of reasoning that disentitles the SRO's conclusion to deference, *cf. R.E.*, 694 F.3d at 189 (noting that, in the IDEA context, "[r]eviewing courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned" (internal quotation marks omitted)); rather, it is a conclusion with which the Parents disagree, but which is nevertheless based upon an apparently careful review of the evidence.  This Court is simply not prepared to say it was wrong.

Plaintiffs also quibble with the SRO's conclusion that W.E. was not denied a FAPE for the 2010–11 school year when the CSE "inexplicably" failed to find W.E. eligible for classification on May 25, 2011.  (Pls.' Mem. 8.)  However, as Defendant points out, the IDEA does not call for instantaneous classification of a student upon suspicion of a disability, (*see* Mem. of Law in Opp'n to Pls.' Cross-Mot. for Summ. J., and in Reply to Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Cross Opp'n") 3 (Dkt. No. 43)); rather, "[o]nce a school has 'reason to suspect a disability,' the school must conduct an evaluation of the child within a reasonable time," *Murphy v. Town of Wallingford*, No. 10-CV-278, 2011 WL 1106234, at *3 (D. Conn. Mar. 23, 2011); *see also W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995) ("Neither the statutes nor regulations establish a deadline by which time children who are suspected of having a qualifying disability must be identified and evaluated, but we infer a requirement that this be done within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability."), *overruled on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007); *Sch. Bd. of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 942 (E.D. Va. 2010) ("Though the 'child find' duty does not impose a specific deadline by which time children suspected of having a qualifying disability must be identified and evaluated, evaluation should take place within a 'reasonable time' after school officials are put on notice that behavior is likely to indicate a disability."); *Reg'l Sch. Dist. No. 9 Bd. of Educ. v. Mr. & Mrs. M.*, No. 07-CV-1484, 2009 WL 2514064, at *8 (D. Conn. Aug. 7, 2009) (noting that "[w]hen a child is identified as potentially requiring special education services, [a local education agency] has a duty to complete the evaluation process," that "failure to complete the process constitutes a denial of a FAPE," and that the agency "must evaluate th[at] student within a reasonable time after notice or suspicion of a disability").  Here, W.E. was referred to the CSE on April 12, 2011,

(*see* Case I Hr'g Tr. 485), and the school year ended on June 30, 2011, *see* N.Y. Educ. Law § 2(15). Even assuming the District had reason to suspect that W.E. had a disability at the time of the CSE meeting, (*cf.* Case I Hr'g Tr. 662 ("Q. So it was possible though to classify [W.E.] at [the time of the May 25, 2011 meeting] as OHI? A. It would have been possible, yes.")), or, earlier still, upon W.E.'s referral, there simply is not sufficient basis to conclude that—*before* the end of the legal school year—a "reasonable time" had come and gone, particularly in light of the fact that the CSE meeting was scheduled when it was, in part, due to M.S.'s schedule, (*see* Case I Hr'g Tr. 503–04), and in light of apparently diligent efforts all around to schedule evaluations with Dr. Hahn, (*see* Pls.' Cross 56.1 ¶ 202, Def.'s Cross 56.1 ¶ 202). Furthermore, the amount of time elapsed between April 2011 and the end of the school year falls short of periods of time that courts have felt comfortable to label legally unreasonable. *See El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 952 (W.D. Tex. 2008) ("In following the majority of federal courts that have considered the issue, this [c]ourt finds that the thirteen months that passed between [the student's] request for evaluation and [the school district's] offer of evaluation was unreasonable."); *St. Pierre*, 307 F. Supp. 2d at 401 (finding that the school district "failed to provide [the student] with an FAPE in a timely manner" where the student "should have been referred to the CSE for evaluation in September 1999," but the "CSE did not perform the evaluation . . . until July 2000, approximately ten months later"); *Dept. of Educ., State of Haw. v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1195–97 (D. Haw. 2001) (finding the department of education "violated the 'child find' provisions [of the IDEA] by failing to evaluate the [s]tudent earlier" where "[t]he record amply supports the hearings officer's [sic] conclusion that the [s]tate had numerous warning signs much earlier than March 12, 1998," and where the hearing officer found that "the [s]tate had, or should have had, reason to suspect by the [s]tudent's [f]all

semester of 1997 . . . that she had a disability and that special education services may be needed

to address that disability").  In any event, there are good reasons to doubt that the federal

judiciary, limited in its insight into matters of sound educational policy, could divine the number

of months that may be thought reasonable in this specialized context.  *See Matula*, 67 F.3d at 501

(noting in the child-find context that the Third Circuit was "not unmindful of the budgetary and

staffing pressures facing school officials," and, therefore, would "fix no bright-line rule as to

what constitutes a reasonable time in light of the information and resources possessed by a given

official at a given point in time").  Therefore, well aware that the "Child Find [provisions of the

IDEA] do[] not demand that schools conduct a formal evaluation of every struggling student,"

and that "[a] school's failure to diagnose a disability at the earliest possible moment is not per se

actionable," *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012), the Court declines to

second-guess the SRO's conclusion that W.E. was not denied a FAPE for the 2010–11 school

year.[16]

### 2.  Tuition Reimbursement

As noted, the Parents also seek reimbursement of tuition paid to Northwood for W.E.'s

freshman and sophomore years (2011–2012 and 2012–2013).  Although the Court defers to the

SRO's conclusion that Northwood was not an appropriate placement for 2011–2012, the SRO's

conclusion with respect to the 2012–2013 school year is neither well reasoned nor persuasive,

and is therefore not entitled to deference.  The Court therefore grants Defendant's Motion for

Summary Judgment with respect to the 2011–2012 school year, but grants Plaintiffs' Motion for

Summary Judgment with respect to the 2012–2013 school year.

---

[16] Because the Court holds that W.E. was not denied a FAPE for the 2010–11 school year, the Court need not decide whether Plaintiffs are entitled to the compensatory relief they seek for that period.

a.  Applicable Law

The Supreme Court has held that if a state fails in its obligation to provide a disabled child a FAPE under the IDEA, the IDEA permits parents to seek reimbursement from school districts for the private placement of the child in a nonpublic school.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246–47 (2009); *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985). "Private placement is reimbursable only if 'such placement, rather than a proposed IEP, is proper under the Act,'" *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 448 (2d Cir. 2015) (quoting *Burlington*, 471 U.S. at 369), *cert. denied*, 136 S. Ct. 2022 (2016), and, therefore, while the IDEA allows a district court hearing civil actions brought under the IDEA to grant "such relief as the court determines is appropriate," *Forest Grove*, 557 U.S. at 237 (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)), parents who unilaterally withdraw their child from the public schools in favor of a private placement do so at "their own financial risk," *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks omitted).

Courts in the Second Circuit use a "three-step process to determine whether parents are entitled to tuition reimbursement."  *Doe*, 790 F.3d at 448 (internal quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009) (same).  "The first two steps concern the adequacy of the IEP: 'whether the school district has complied with the IDEA's procedural requirements' and 'whether the IEP is reasonably calculated to enable the child to receive educational benefits.'"  *Doe*, 790 F.3d at 448 (quoting *T.Y.*, 584 F.3d at 417).  "The third step concerns the appropriateness of the parent[s'] placement: 'whether the private schooling obtained by the parents is appropriate to the child's needs.'"  *Id.* at 448–49 (quoting *T.Y.*, 584

F.3d at 417).[17]  If it is, "equitable considerations" must "support the [parents'] claim." *A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193, 205 (S.D.N.Y. 2010); *see also Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363–64 (2d Cir. 2006) ("[E]quitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief." (second alteration in original) (internal quotation marks omitted)).

Although, conceptually, the process articulated above may seem to call for a district court to consider whether an IDEA defendant denied the student a FAPE before reaching the question of whether the private schooling was appropriate, where, as here, the SRO concluded that the school district denied the student a FAPE and where the district does not argue otherwise in a subsequent civil action, district courts customarily skip directly to the analysis of whether the parents' private placement was appropriate, *see, e.g.*, *K.S. v. N.Y.C. Dep't of Educ.*, No. 11-CV-7443, 2012 WL 4017795, at *6 (S.D.N.Y. Aug. 8, 2012) (noting that, "[o]n appeal, neither party contest[ed] the issue of whether the IEP proposed by the district was appropriate," and that, "[t]herefore, the first prong of the *Burlington* test [was] considered resolved in favor of [the] [p]laintiffs"); *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514, 518, 525–26 (S.D.N.Y. 2011) (noting that "[the] [d]efendant [did] not contest the SRO's finding that the IEP did not provide a FAPE," and analyzing the appropriateness of the student's placement accordingly); *R.S. ex rel. A.S. v. Lakeland Cent. Sch. Dist.*, No. 09-CV-9874, 2011 WL 1198458, at *4

---

[17] The Second IHO Opinion is broken out into three "prongs"—the first dealing with procedural and substantive issues underlying the IEP, the second being the appropriateness of the Parents' placement, and the third being the other circumstances under which tuition reimbursement can be reduced or denied.  (*See generally* Case II IHO Op.)  This perhaps stems from the different articulations of the inquiry within case law from the Second Circuit; however, the analytical framework is for all relevant purposes the same.  *See Doe*, 790 F.3d at 448 n.6 ("Our cases have sometimes collapsed the first and second steps into a single inquiry and, accordingly, characterized the analysis as having two (not three) steps.  This is a difference of enumeration, not of substance." (citations omitted)).

(S.D.N.Y. Mar. 30, 2011) (noting that, "[i]n this case, the parties do not dispute the IHO and SRO finding that the District failed to provide [the student] with a FAPE," and that, "[t]hus, the only issue is whether the plaintiffs' unilateral placement of [the student] at [the private school] was appropriate"), *aff'd*, 471 F. App'x 77 (2d Cir. 2012); *Stevens ex rel. E.L. v. N.Y.C. Dep't of Educ.*, No. 09-CV-5327, 2010 WL 1005165, at *8 (S.D.N.Y. Mar. 18, 2010) (noting that, "[i]n this case, the defendant conceded that it did not provide the [s]tudent with a FAPE for the 2007–08 school year," and that, "[t]herefore prong 1 of the *Burlington-Carter* test is resolved in favor of [the plaintiff]").

When seeking reimbursement for a unilateral placement, "[t]he parents bear the burden of showing that the private placement they selected was appropriate for the child." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014); *see also T.K.*, 810 F.3d at 875 ("Under New York law, the Department [of Education] bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement." (internal quotation marks omitted)). "A private placement is appropriate if it is reasonably calculated to enable the child to receive educational benefits, such that the placement is likely to produce progress, not regression." *T.K.*, 810 F.3d at 877 (citations and internal quotation marks omitted). The Second Circuit has instructed courts making these determinations to "consider the totality of the evidence, including 'grades, test scores, regular advancement, or other objective evidence.'" *Id.* (quoting *C.L.*, 744 F.3d at 836). The "test for the parents' private placement is that it is appropriate, and not that it is perfect." *C.L.*, 744 F.3d at 837 (internal quotation marks omitted). Moreover, "[p]arents bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE because 'parents are not barred from reimbursement where a private

school they choose does not meet the IDEA definition of a [FAPE].'" *T.K.*, 810 F.3d at 878

(second alteration in original) (quoting *Frank G.*, 459 F.3d at 364).  Finally, a unilateral private

placement is appropriate only if it provides "educational instruction specially designed to meet

the unique needs of a handicapped child." *Frank G.*, 459 F.3d at 365 (internal quotation marks

omitted).  Parents can, however, overshoot, and, "even where there is evidence of success in the

private placement, courts should not disturb a state's denial of IDEA reimbursement where the

chief benefits of the chosen school are the kind of advantages that might be preferred by parents

of any child, disabled or not." *M.H.*, 685 F.3d at 246 (alterations and internal quotation marks

omitted).  While "a child's progress is relevant to [a] court's review" in this context, "such

progress does not itself demonstrate that a private placement was appropriate." *Gagliardo*, 489

F.3d at 115.

        Before diving into the relevant analysis, a quick word on the peculiar procedural posture

of this case is in order.  As noted, the lawsuit relating to W.E.'s freshman year (2011–2012) was

consolidated with the lawsuit relating to his sophomore year (2012–2013).  Because the issue in

both cases is whether Northwood was an appropriate placement, the record in one case will

logically bear upon the analysis in the other—and with greater force still by virtue of the fact that

both cases shared the same SRO.  (*Compare* Case I SRO Op. 32, *with* Case II SRO Op. 25.)

While courts do not artificially ignore the analytical cross-fertilization that naturally arises in

such circumstances, *cf. Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 557

(S.D.N.Y. 2010) (characterizing as "useful" information the fact that "the same

SRO . . . presided over" two separate SRO proceedings subsequently consolidated into a single

civil action before the district court, and that "[that SRO] was presumably familiar with the

testimony from" one of the underlying IHO proceedings), the extent of deference to which an

opinion is entitled turns in large measure on the Court's appraisal of the SRO's reasoning, *see, e.g.*, *R.E.*, 694 F.3d at 189 (noting that "the deference owed to an SRO's decision depends on the quality of that opinion," as judged at least in part by "the factors that normally determine whether any particular judgment is persuasive" (internal quotation marks omitted)).  Given the material differences between the SRO's two opinions in terms of quality and persuasiveness, the Court will endeavor to separately analyze the question of whether Northwood was an appropriate placement for each year, considering both the record evidence and the reasoning applied by the SRO in each instance.

### b.  2011–12 School Year

In arguing that W.E.'s placement at Northwood was appropriate for the 2011–2012 school year, Plaintiffs offer a number of critiques of the IHO's and SRO's decisions, (*see* Pls.' Mem. 19–21), as well as a host of reasons that they believe the placement was appropriate, (*see id.* at 14–19, 22).  The Court begins with the former.

### i.  Critiques of the IHO's and SRO's Opinions

At its core, Plaintiffs' position concerning the respects in which the hearing officers erred can be distilled to the proposition that they overlooked evidence at the hearing, specifically Drs. Williams's and Robins's testimony concerning W.E.'s needs and the School, (*see* Pls.' Mem. 19–20 (citing Case I Hr'g Tr. 925–26, 1451–52, 1462–63)); focused too singularly on W.E.'s persistent organizational issues without taking adequate stock of the extent to which they improved during W.E.'s freshman year, to the exclusion of considering the broader impact of the migraines as a whole, (*see id.* at 20–21 (citing Case I Hr'g Tr. 183, 1056–57, 1729, 1818–19; Case I Pls.' Ex. MM)); and failed to consider W.E.'s accommodation plan or the gains he made at Northwood with respect to his decreased feeling of isolation, positive reputation among his

teachers, need for medication, grades, and other evaluation by his teachers, (*see id.* at 21–22 (citing Case I Hr'g Tr. 1565–66, 1579–80, 1778, 1814–15; Case II Pls.' Ex. H)).

After reviewing the SRO's and IHO's opinions as well as the record more generally, the Court is satisfied that although not all of the reasoning in the SRO's and IHO's opinions is persuasive, the SRO and IHO did consider the relevant evidence and it is appropriate in this circumstance to afford deference to their conclusions.  With respect to Plaintiffs' concern that the hearing officers did not take adequate stock of Drs. Williams's and Robins's testimony, the SRO devoted a considerable amount of attention to the input of doctors who were familiar with W.E., including not just Drs. Williams and Robins, but also Drs. Hahn and Lasser.  (*See* Case I SRO Op. 25–27.)  In fact, the SRO specifically considered Dr. Williams's testimony characterizing as the "best solution" for W.E. "a boarding school setting where there was a supportive environment with small class size, guidance available on a more frequent and regular basis, and the availability of outdoor activities."  (Case I SRO Op. 27 (alteration and internal quotation marks omitted) (citing, inter alia, Case I Hr'g Tr. 923–24)).  That he did not go on to quote the next page of the transcript too, where Dr. Williams characterized Northwood as "highly appropriate," does not make the SRO's decision "poorly reasoned," (Pls.' Mem. 19 (citing (Case I Hr'g Tr. 925)); rather, it means only that the SRO, unlike Plaintiffs, did not regard this testimony as "dispositive," (*id.*).

Plaintiffs' contentions are similarly unconvincing with respect to Dr. Robins's testimony. Under the heading "The IHO and SRO Findings Disregard Uncontested Facts," Plaintiffs recount how Dr. Robins "qualitatively confirmed the success of [W.E.]'s placement . . . and the [S]chool's success in addressing his emotional needs," in that Dr. Robins testified that the BASC-2 he administered in February 2012 showed a two-standard-deviation shift for the

positive in W.E.'s attitude toward school, relative to W.E.'s seventh-grade BASC-2.  (*See* Pls.' Mem. 20.)  The IHO, however, considered this very same testimony, even noting the two-standard-deviations shift, but did not find it satisfactory to conclude that Northwood was an appropriate placement in light of what the IHO considered insufficient evidence concerning Northwood's attention to W.E.'s specific emotional, counseling, and organizational needs.  (*See* Case I IHO Op. at unnumbered 35–36.)  It is unclear from Plaintiffs' submission whether they realized that the IHO expressly considered this testimony; however, at a minimum, its presence undercuts Plaintiffs' assertion that the hearing officers overlooked such testimony, and, with it, counsels against dismissing their decisions as the product of poor reasoning.

While the Court partially shares Plaintiffs' concern that the IHO and SRO put too much emphasis on W.E.'s organizational issues, (*see* Pls.' Mem. 20), the record supports the conclusion the organizational difficulties continued to frustrate W.E. midway through the year, (*see* Case I Pl.s' Ex. TT (noting that W.E.'s biology teacher "[would] continue trying to help [W.E.] work on his organization")).  While it may be true, as Plaintiffs contend, that M.S. determined that W.E. had become better organized because of his ninth-grade planner, (*see* Pls.' Mem. 21), such progress is not talismanic, *cf. Gagliardo*, 489 F.3d at 115 (noting that "a child's progress is relevant to the court's review," but "does not itself demonstrate that a private placement was appropriate"), and failure to be convinced by such progress does not corrode the hearing officers' reasoning.

Less clear is whether the hearing officers gave appropriate weight to the other respects in which the migraines impaired W.E.'s well-being or the other respects in which he improved, including through the accommodation plan.  The opinions make clear, however, that the hearing officers considered parts of the record relating to issues that Plaintiffs insist went

"[d]isregard[ed]"—specifically, the sheer volume and effects of W.E.'s absences cause by migraines,[18] the social and interpersonal developmental progress W.E. showed at Northwood,[19] that W.E. had successfully withdrawn from certain medications,[20] and Northwood's accommodation plan.[21]   In short, the Court is not persuaded that the putative flaws in the hearing officers' opinions to which Plaintiffs point are so serious as to strip those opinions of the deference they are normally afforded.  While the Court believes that Plaintiffs sincerely and perhaps correctly believe that W.E.'s improvement during his first year at Northwood was remarkable, that does not mean that the hearing officers' conclusions must have been the product of poor reasoning.

---

[18] (*Compare* Pls.' Mem. 20 (indicating that the SRO and IHO "ignor[ed]" such issues as that "[t]hese migraines caused him to miss 108 days of classes in the eighth grade and receive medical incompletes, resulting in a denial of credit, in 8 classes" leading to increased anxiety), *with* Case I SRO Op. 4, 27 (noting that W.E.'s cycle of headaches led to over 100 absences and that Dr. Robins noted W.E. identified the "stress[] of falling behind with peers and school work" as headache triggers), *and* Case I IHO Op. at unnumbered 16 (noting that the District stipulated that W.E. received "medicals" in several classes and citing W.E.'s report card).)

[19] (*Compare* Pls.' Mem. 21 (indicating that the SRO and IHO "failed to note that [W.E.] went from a socially isolated individual to being fully integrated with his class members"), *with* Case I SRO Op. 31 (noting that "the hearing record supports a finding that the student's social/emotional . . . functioning improved since the end of the 2010–11 school year"), *and* Case I IHO Op. at unnumbered 35 (noting testimony that W.E. had been "doing 'really well' with his peers" at Northwood).)

[20] (*Compare* Pls.' Mem. 21 (asserting that "[t]he IHO and SRO disregarded entirely the reduction in medication that [W.E.] had previously taken" in that he "was able to stop taking Depakote and Amitriptyline"), *with* Case I IHO Op. at unnumbered 35 (noting that "[t]he student's mother testified about the student's progress," including that "[W.E.] is off the Depakote, [and] he is off the Amitriptyline").)

[21] (*Compare* Pls.' Mem. 21 ("The IHO and SRO also make no mention of [Northwood's] Accommodation Plan, its various elements and how it essentially tracked the District's accommodation provisions."), *with* Case I SRO Op. 28 ("[Northwood] developed an 'official accommodation plan' based upon [W.E.'s] June 2010 section 504 accommodation plan.").)

<u>ii.  Why Plaintiffs Believe Northwood Was Appropriate</u>

Having so concluded, the Court now turns to Plaintiffs' arguments concerning why

Northwood was an affirmatively appropriate placement for W.E. in order to assess whether such

analysis counsels against affording deference to the IHO's and SRO's decisions.  The principal

argument Plaintiffs make is that W.E. improved in many important respects and that certain

features of the School made it particularly appropriate.  The Court will consider each in turn.

<u>*W.E.'s Improvement*</u>

To begin, the Parents argue that Northwood was appropriate because of the numerous

ways in which W.E. improved while there.  Specifically, the Parents stress (i) W.E.'s health

improvements revealed through the abatement of his migraines with their attendant school-

attendance problems and improved February 2012 BASC-2 test results, (*see* Pls.' Mem. 17), (ii)

his improved academic performance, (*see id.* at 17–18), and (iii) his involvement in the school

and the various programs that it offered, (*see id.* at 18–19).  Each deserves attention.

First, although the record indicated substantial improvement in W.E.'s health and

attendance record, the SRO concluded that Northwood's program still did not "provide[] [W.E.]

with educational instruction specially designed to meet his unique needs," inasmuch as the

hearing record lacked evidence demonstrating that Northwood "provided

instruction . . . designed to address [W.E.'s] tendencies to develop physical symptoms and

exhibit school avoidance when under stress."  (Case I SRO Op. 31.)  It is true that mere

correlation between private school placement and general behavioral improvement does not, on

its own, establish that a nonpublic school was an appropriate placement for a student.  *See R.C.*

*ex rel. N.C. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, No. 07-CV-2806, 2008 WL 9731174,

at *2 (S.D.N.Y. July 7, 2008); *see also Gagliardo*, 489 F.3d at 115 ("[E]ven where there is

evidence of success, courts should not disturb a state's denial of IDEA reimbursement where, as here, the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not.").  At the same time, however, it is difficult to overstate the improvement in W.E.'s attendance record—W.E. went from missing over 100 days of school in the eighth grade to just nine in his first year at Northwood.  (*See* Case I Joint Ex. 67 (attendance summary); Case II Pls.' Exs. T, U (logs); *see also* Pls.' Cross 56.1 ¶ 328; Def.'s Cross 56.1 ¶ 328.)  While the Court "lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," *Gagliardo*, 489 F.3d at 113 (alteration and internal quotation marks omitted), the significance of such a change in attendance is hardly a question of educational policy.  And it belies common sense to suggest that W.E.'s improvement in this regard was not attributable to specific improvements in his educational environment.  Still, however, "the parents bear the burden of establishing the appropriateness of the private placement," *T.K.*, 810 F.3d at 875, and although W.E.'s attendance showed significant improvement, W.E.'s attendance record was only a single aspect of his troubles in public school.  Improvement in one area in which the student struggled is insufficient, on its own, to carry Plaintiffs' burden.[22]

Next, considering W.E.'s grades (shorn of the influence that his attendance difficulties had on them), the evidence does not contradict the IHO's and SRO's conclusion that Northwood was not an appropriate choice.  To the contrary, comparing W.E.'s report card from eighth grade

---

[22] Although the Court lacks the "specialized knowledge and educational expertise," *M.W.*, 725 F.3d at 138, to assess the meaningfulness of changes in BASC-2 scores over time, one would imagine that it is not wholly irrelevant that, a few months after the February 2012 BASC-2 test, W.E.'s English teacher shortly thereafter rated him as clinically significant for somatization and at risk for social skills, (*see* Case II Def.'s Ex. 13 (Lupiani Psychological Evaluation)).

with his report cards from Northwood shows improvement not so much in the caliber of grades

he received, but rather in that he no longer received medicals.  Indeed, in eighth grade, W.E.

received one B+, several A-s, two A+s, and numbered grades ranging between 78 and 93.  (*See*

Case I Joint Ex. 70 (8th Grade Report Card).)  In the first two marking periods at Northwood, his

quarterly grades reflect one C, three C+s, one B, two B+s, two A-s, and one solid A, and his

semester grades reflect a range between C and A-.  (*See* Case I Pls.' Exs. PP, TT.)  While it is, to

be sure, no small feat to academically overcome a year like W.E.'s eighth grade, and it may even

be prudent, as M.S. did, to expect some academic headwinds afterwards, (*see* Case I Hr'g Tr.

1815), W.E.'s grades—even in light of the additional indicia of academic progress M.S. noted,

(*see* Pls.' Mem. 18)—do not lead the Court to question the hearing officers' reasoning.

Last of all, the benefits that W.E. reaped by becoming engaged in the School community

do not compel a conclusion contrary to that reached by the IHO and the SRO.  It may be true that

the activities in which W.E. participated had therapeutic benefits and prevented him from being

isolated, (*see* Pls.' Mem. 18–19), and that Northwood's staff "ha[d] a lot of faith in the school's

therapeutic culture" that would help W.E. come to see it "as a positive and psychologically safe

place," (Case I Pls.' Ex. VV), but the simple fact that a School's culture generally assisted a

historically disabled student does not make it specially designed to meet that student's unique

needs, *see John M. v. Brentwood Union Free Sch. Dist.*, Nos. 11-CV-3634, 12-CV-2603, 2015

WL 5695648, at *9 (S.D.N.Y. Sept. 28, 2015) ("Though the general educational environment at

[a particular school] may have been one where rules were enforced and bullying was not

tolerated and where staff 'encouraged' the students, these benefits are nothing more than 'the

kind of educational and environmental advantages and amenities that might be preferred by

parents of any child, disabled or not,' and do not warrant a grant of tuition reimbursement under

the IDEA, or disturbing the SRO's denial of reimbursement in this case." (quoting *Gagliardo*, 489 F.3d at 115)).

Therefore, while the indicia of progress to which Plaintiffs point are, of course, "relevant," they are not dispositive and do not, without more, "demonstrate that a private placement was appropriate." *Gagliardo*, 489 F.3d at 115. While W.E. showed significant progress, that is not enough to show that Northwood was an appropriate placement.

### *Northwood's Features*

Plaintiffs also make several other arguments in favor of Northwood that deserve attention. In so doing, Plaintiffs focus on Northwood's small environment, boarding component, structure, principles, associated activities, low student-to-teacher ratio, supervised study time, close contact between adults and students, "counseling" sessions with Mellor, and access to school nurses. (*See id.* at 14–16 & n.12 (citing Case I Hr'g Tr. 381–87, 1059, 1554, 1564–66, 1572–73, 1577, 1782, 1796–99, 1807, 1817, 1824–26; Case II Hr'g Tr. 400; Case I Joint Ex. 50a (Williams letter)).) Additionally, Plaintiffs argue that Northwood's accommodation plan "paralleled the District's Section 504 plan." (*See id.* at 16–17.) Many of Northwood's unique features are discussed below in reference to the 2012–2013 school year. (*See infra.*) While some of Northwood's features weigh in favor of reimbursement, the Court is not persuaded that the SRO's decision with respect to the 2011–2012 school year is infirm on the basis of these features alone.

First, the Court is not prepared to second-guess the SRO's and IHO's determination that the counseling W.E. received was not tailored to W.E.'s needs. According to Plaintiffs, such counseling "took place in [W.E.]'s dorm, in the school cafeteria and during rock climbing in the Adirondacks, where the conversation was less restricted and more open than a conversation

might be in a closed-door office." (Pls.' Mem. 16.) Although the SRO considered the same

testimony that led Plaintiffs to argue that W.E. in fact did receive supportive counseling,

(*compare* Case I SRO Op. 28–29 (citing, inter alia, Case I Hr'g Tr. 1564–65, 1572–73), *with*

Pls.' Mem. 16 (citing Case I Hr'g Tr. 1564–65, 1572–73)), the hearing and review officers did

not think that such counseling made Northwood an appropriate placement, instead concluding

that "[Northwood's] counselor offered no testimony regarding the student's social/emotional

needs or counseling needs, such that the hearing record contained no evidence that

the . . . counselor was familiar with [W.E.'s] needs," (Case I SRO Op. 31). Moreover, the IHO

noted that, in its view, the only aspect of the counseling that was "designed to meet [W.E.'s]

specific needs," was its "less-structured format of checking in with the student in a more natural

way or on his turf." (Case I IHO Op. 36.) In this respect, it is striking that, in their

Memorandum of Law, Plaintiffs specifically characterize W.E.'s conversations "during rock

climbing in the Adirondacks" as "counseling . . . . sessions" and cite pages 1564–65 of the

hearing transcript, (*see* Pls.' Mem. 16), where Mellor, when asked about "speaking with [W.E.]

while climbing," testified that "this [was not] just specific to [W.E.]," (Case I Hr'g Tr. 1565).[23]

The Court recognizes that an element of personal tailoring inheres in the decision to modify an

approach to counseling based on the student's response. However, despite their understanding of

the sort of counseling that W.E. received, both the IHO and the SRO concluded that this was not

enough to bring W.E.'s education within the ambit of reimbursable private schools. Given that

---

[23] Specifically, Mellor testified:

Q.     You would also be speaking with him while climbing?
A.     Oh, yes, as we watch all the kids, he is in the van for 15 or 20-minute drive,
I am watching the way he interacts with all kids, this isn't just specific to [W.E.],
all kids, we pull them aside and make a little comment about the way they interact
and how is it going, did you get that paper done for Miss Farmer, that kind of thing.
(Case I Hearing Tr. 1565.)

the IHO's and SRO's reviews were "thorough and careful," *P. ex rel. Mr. & Mrs. P.*, 546 F.3d at

118, and in agreement, *see A.A.*, 2015 WL 10793404, at *10, the Court is satisfied that deference

to their determination is appropriate, *cf. Doe*, 790 F.3d at 450 (concluding in context of challenge

to IEP that the specifics of a therapy regime was subject to judicial deference).

By contrast, the Court finds the SRO's reasoning with respect to Northwood's small,

boarding school style unpersuasive.  The SRO determined that the School's "residential

setting . . . merely eliminated [W.E.'s] exposure to the public school environment and to

activities that he perceived as stressful," but that that was not the same as "provid[ing] [W.E.]

with educational instruction specially designed to meet his unique needs."  (Case I SRO Op. 31.)

But the record indicates that W.E. was in need of a smaller school environment to help reduce

his stress and combat his health issues.  (*See* Case I Joint Ex. 50a (Williams letter), at 2

(recommending a "smaller school environment, with small classes, where [W.E.] [could] receive

both supportive counseling and educational services that enable him to return to normal social

and educational functioning"); Case I Joint Ex. 50b (Lasser letter) (recommending a "small

supportive school environment"); Case I Joint Ex. 51 (Robins letter), at 2 (positing that "it [was]

unlikely that [W.E.] [would] succeed in the 9th grade if he continue[d] in the mainstream public

school system")).  And while it is true that the mere fact that a student is better suited for

boarding school does not mean that the specific boarding school chosen was an appropriate

placement, *cf. Eschenasy v. N.Y.C. Dep't of Educ.*, 604 F. Supp. 2d 639, 644, 651–52 (S.D.N.Y.

2009) (noting that the student's therapist recommended that the student be placed in a therapeutic

boarding school, and concluding that, while one boarding school was an appropriate choice for

the student, another was not), the fact that Northwood's boarding aspect provided benefits

specific to W.E. counsels a least slightly in favor of reimbursement.  The Court is not persuaded, however, this fact alone is reason enough to impugn the SRO's opinion.

The Court also finds unpersuasive the SRO's conclusion that other provisions listed in W.E.'s Northwood accommodation plan—extra time to complete assignments, preferential seating, and the use of graphic organizers or guided notes, (*see* Case I Pls.' Ex. MM (Northwood accommodation plan))—were not tailored to W.E.'s needs.  The SRO, for instance, mentioned Mellor's testimony that "[w]hat's interesting in a lot of IEPs and accommodation plans is the nature of [Northwood's] regular offering covers a lot of typical requests such as sitting in front," and that such accommodations as "[e]xtended time on work," "[u]se of any electronic or any assistive devices" are both "pretty routine."  (Case I Hr'g Tr. 1790; *see also* Case I SRO Op. 29–30.)  But the fact that other students at Northwood required similar accommodations says nothing about the appropriateness or effectiveness of the accommodations made for W.E.  The law does not require Plaintiffs to prove that Northwood provided W.E. with exceptional attention above that offered to other students, only that W.E. received benefits specially designed to address his unique needs.  *See Frank G.*, 459 F.3d at 365.  There is little question that W.E. required extra time to complete assignments and benefitted from preferential seating and graphical organizers, and there is no question that those accommodations targeted specific needs of W.E.  The reasoning of the SRO and IHO is thus not persuasive here.  Again, however, the Court is not persuaded that these accommodations, standing on their own, are significant enough to satisfy Plaintiffs' burden of showing that Northwood was an appropriate placement during the 2011–2012 school year, especially in light of the SRO's conclusions regarding the lack of meaningful counseling and the lack of mechanisms to help W.E. deal with his organizational or

stress issues.  (*See* Case I SRO Op. 31.)  Therefore, the Court defers to the hearing officers'

conclusion that Northwood was not an appropriate placement for W.E.'s freshman year.

### c.  2012–13 School Year

Unlike with the 2011–12 school year, the SRO (who was the same as in Case I) and the

IHO (who was not) reached differing conclusions as to whether Northwood was an appropriate

placement for W.E.'s sophomore year.  As noted above, although W.E. received many of the

same benefits from Northwood in both his freshman and sophomore years, the pertinent inquiry

for the Court is whether the SRO's opinion persuasively addressed the record and whether the

decision of the SRO is supported by the facts available on the record.  *See R.E.*, 694 F.3d at 189

(noting that "the deference owed to an SRO's decision depends on the quality of that opinion,"

as judged at least in part by "the factors that normally determine whether any particular judgment

is persuasive" (internal quotation marks omitted)).  If not, deference to the SRO's opinion is not

appropriate, and the Court may consider the IHO's opinion and the facts on the record to

conclude whether the nonpublic school was an appropriate placement.  *See M.H.*, 685 F.3d at

246 ("[If] the SRO's determinations are insufficiently reasoned to merit deference . . . , it is

entirely appropriate for the court . . . to consider the IHO's analysis.").  Importantly, "in

situations when an SRO reverses the finding of an IHO, the court should give substantial

deference to the SRO's views of educational policy, but less to the SRO's factual findings or to

its reasoning in general."  *S.C.*, 2016 WL 1267802, at *11 (internal quotation marks omitted).

### i.  Adequacy of the SRO's Opinion

Unlike the SRO's decision in the first case, the SRO's decision with regard to the 2012–

2013 school year failed to give adequate weight to many of Northwood's most beneficial

features and erroneously discounted the value of some of those features merely because they

were generally available to all students. (*See* Case II SRO Op. 24–25.)  Indeed, although the SRO provided a thorough recitation of the facts on the record, it dedicated barely two pages to actually analyzing whether Northwood was an appropriate placement.  (*See id.* at 23–25.)

Moreover, the SRO focused almost exclusively on W.E.'s need to cope with his stress-related issues.  (*See id.*)  Coping and managing stress was one of the goals identified in W.E.'s 2012–2013 IEP.  (*See* Case II Def.'s Ex. 18, at 4.)  But also included in W.E.'s IEP were needs such as strengthening organization and study skills, improving notetaking skills, making school personnel available during stressful situations, and offering a supportive and structured environment.  (*See id.* at 4–5.)  As discussed below, these goals were addressed by Northwood, both by the features generally available to all students and by the specific accommodations implemented for W.E.  The SRO's fixation on W.E.'s stress issues calls into question the quality of the SRO's opinion, and thus counsels against affording the SRO opinion deference.  *See R.E.*, 694 F.3d at 189.

By contrast, the IHO opinion identified each accommodation or benefit provided by Northwood and analyzed how, if it all, that feature served a specific need of W.E.  (*See* Case II IHO Op. 14–19.)  While not all of the IHO's reasoning is thorough or persuasive, the Court is satisfied that, at the very least, the IHO both considered the evidence in the record and examined it in a meaningful way.  Accordingly, the Court will take into consideration the IHO's reasoning and conclusions in determining whether Northwood was an appropriate placement.

### ii.  Benefits Provided by Northwood

Plaintiffs make five arguments regarding the appropriateness of W.E.'s placement at Northwood: (1) that Northwood provided W.E. various educational, emotional, and social benefits, (2) that Northwood provided W.E. specially designed services for his unique needs

through his accommodation plan, (3) that individualized counseling was appropriate for W.E.,

(4) that nursing services were individualized and targeted for W.E.'s needs, and (5) that small

class sizes benefited W.E.,. (*See* Pls.' Mem. 23–28.)  The Court will consider each argument in

turn.

<u>*Educational, Emotional, and Social Benefits*</u>

To begin, Plaintiffs argue that W.E. received numerous educational, emotional, and social

benefits from Northwood, as judged by his grades, his attendance, the esteem in which faculty

and classmates held him, his social integration with the community, and his participation in

extracurricular activities, such as leading the kayaking program and serving as JV soccer goal

keeper.  (*See* Pls.' Mem. 23–24.)  With respect to the perception of W.E. among students and

classmates and W.E.'s integration into the community, the analysis already applied similarly

counsels against setting aside the SRO's determination on these grounds.  The question,

therefore, is whether W.E.'s academic performance and his participation in extracurricular

activities, in light of the IHO's and SRO's conflicting conclusions, should strip the SRO's

opinion of the deference to which it should be entitled.

With respect to W.E.'s grades and academic performance, a review of the hearing

officers' opinions indicates that some deference to the SRO is in order.  The SRO analyzed the

record in some detail, considering not just W.E.'s report cards through the third quarter of his

sophomore year, (*see* Case II Pls.' Exs. H–J, L (report cards), Case II Def.'s Ex. 15 (3rd marking

period report card)), but also W.E.'s teachers' evaluation reports, (*see* Case II Def.'s Ex. 8

(teacher evaluation reports)), Dr. Williams's evaluation, (*see* Case II Def.'s Ex. 17 (Dr. Williams

June 2012 letter)), Coughlin's observation of W.E. in class, (*see* Case II Def.'s Ex. 6), and Dr.

Lupiani's May 11, 2012 evaluation of W.E., (*see* Case II Def.'s Ex. 13); *see also* (Case II SRO

Op. 14–15, 23–24), and concluding that the School provided W.E. "with 'the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not,'" (Case II SRO Op. 24 (quoting *Gagliardo*, 489 F.3d at 115).)  The SRO's conclusions are largely borne out by the record: W.E.'s quarterly grades ran the gamut from several C+s to an A-, and his first semester grades fell between C+ and B+.  (*See* Case II Pls.' Ex. L.)  Somewhat more qualitatively, as the SRO notes, the teachers' feedback was a mix of praise, (*see, e.g.*, *id.* at 1 ("[W.E.] is among the quickest and most sophisticated students in his grade level—except for his reading.")), and critiques, (*see, e.g.*, *id.* at 2 ("[W.E.'s] overall participation and conduct in [Spanish] class has been less than satisfactory.")).

   Although Plaintiffs take issue with the District's quotation of certain evaluations, arguing that "[t]hree different [Northwood] staff members, including two teachers, testified and each provided complimentary views of [W.E.]," and positing that "for each apparent negative comment in a report card, three corresponding positive comments exist," (Pls.' Mem. 23 n.18), the SRO did acknowledge a wide variety of indicia of W.E.'s progress, (*see* Case II SRO Op. 17–18 (noting, among other things, testimony that the student was a "bright young man" (citing Case II Hr'g Tr. 426–27))).  The SRO's analysis of W.E.'s academic progress was thus not infirm.  It bears noting, however, that academic progress, though not dispositive, may nonetheless be "relevant."  *Gagliardo*, 489 F.3d at 115.  Nothing in the SRO's opinion suggests that W.E.'s progress was not significant or relevant to question of the appropriateness of Northwood, merely that, in the SRO's view, other deficiencies at Northwood counseled against reimbursement.  Accordingly, because W.E.'s academic progress was relevant, but not dispositive to the SRO, the Court will consider this factor as weighing slightly in favor of reimbursement.

The Court finds no error with the SRO's conclusion with respect to W.E.'s role in activities such as kayaking and soccer. (*See* Pls.' Mem. 23–24.) It is clear that the SRO was aware of these features of the school, (*see* Case II SRO Op. 22 ("Both the guidance director and the western civilization teacher testified that the student benefitted from additional 'nonacademic' activities such as soccer, whitewater rafting, and kayaking.")), but, all the same, he concluded that, while it was "understandable why the [P]arents selected a placement such as [Northwood]," the School was still not shown by the record to "provide [W.E.] with specially designed instruction to address organizational needs, the need to develop insight, and his underlying vulnerability toward and lack of coping skills related to anxiety, stress, and somatization," (*id.* at 24). It is true that there is evidence suggesting that W.E. was in a position to benefit from Northwood's outdoor programs, (*see, e.g.*, Case II Hr'g Tr. 1320 (testimony from Dr. Rissenberg concerning the benefit W.E. received "of being with classmates in the classroom and also in the outdoors activities")); however, it is also true that a school that offers certain athletic programs does not necessarily become an appropriate placement simply by virtue of testimony that the program would do the student good, *see L.K. ex rel. Q v. Ne. Sch. Dist.*, 932 F. Supp. 2d 467, 479, 483, 489–91 (S.D.N.Y. 2013) (noting that a witness testified that a student's physical activity needs could be addressed through participation in an equestrian program and after school athletics, but affirming the SRO's view that the school was not an appropriate placement in part because all students participated in the equestrian program and that the program was therefore "not individualized to meet [the student's] unique education needs").

As above, however, the SRO failed to give any meaningful attention to the substantial improvement in W.E.'s attendance record. Again, while the Court will not substitute its own view of educational policy for those of the SRO, *see Gagliardo*, 489 F.3d at 113, the dramatic

improvement in W.E.'s attendance record while at Northwood can hardly be overstated—W.E. missed a total of 10 days during his sophomore year, nine of which were attributed to migraines, (*see* Case II Pls.' Ex. N).  And the record indicates that W.E.'s improvement in attendance was not a consequence of circumstance, but rather was attributable to Northwood's boarding feature, (*see* Case I Hr'g Tr. 893–94, 923; Case II Hr'g Tr. 1288, 1322), and small class size, (*see* Case I Hr'g Tr. 1055–57; Case II Hr'g Tr. 383–86).  Again, the failure of the SRO to discuss this improvement calls into question the thoroughness and persuasiveness of the SRO's decision.  At the very least, W.E.'s improvement in attendance, though not dispositive, is relevant evidence of the appropriateness of Northwood, *see Frank G.*, 459 F.3d at 364 ("[C]ourts assessing the propriety of a unilateral placement [should] consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs."), and the SRO ought to have at least acknowledged the significance of this improvement.

### *Accommodation Plan*

Next, according to Plaintiffs, the SRO "ignore[d] . . . detailed testimony on the implementation of the Accommodation Plan and the targeted services for [W.E.]"  (Pls.' Mem. 24.)  In so arguing, Plaintiffs focus on two changes made in W.E.'s accommodation plan during the first weekend in October 2012: the use of an iPad for his classes and the addition of a second study period.  (*See id.*)[24]  The SRO noted that the accommodations listed on W.E.'s October 2012 plan were "available to most if not all [Northwood] students," but ultimately found them insufficient to make Northwood an appropriate placement because "the hearing record [did] not include information about how [Northwood] addressed the student's needs identified by the

---

[24] The Accommodation Plan was also updated to include "[a]ccess to school nurse" as an accommodation and to note that W.E. no longer took medication for his condition.  (*Compare* Case II Pls.' Ex. C, *with* Case II Pls.' Ex. D.)

parents in their suggested goals, or how it otherwise provided specially designed instruction to address the student's organizational difficulties." (Case II SRO Op. 24.)

With respect to W.E.'s use of the iPad, although the SRO mentioned the use of the iPad in its summary of the features and services available at Northwood, the SRO made no reference to the device in its analysis of whether Northwood was an appropriate placement. (*See* Case II SRO Op. 23–25.) To be sure, the iPad was but one aspect of Northwood's accommodations, but testimony before the IHO indicated that the iPad was a "godsend" for W.E., (Case II Hr'g Tr. 381), and helped W.E. with organizational skills, (*see id.* at 381–83), which he had struggled with in the past, (*see* Case II Def.'s Ex. 8 (teacher evaluation reports), at unnumbered 2, 4, 5; *see also* Def.'s 56.1 ¶¶ 128–32; Pls.' 56.1 ¶¶ 128–32). This point is particularly pertinent in light of the fact that the SRO concluded that the record did not indicate that Northwood had "provided [W.E.] with specially designed instruction to address organizational needs," (Case II SRO Op. 24), an observation belied by uncontested testimony. And it is no answer to say that the iPad could not be specially designed to address W.E.'s unique needs simply because it was generally available to all other students—the Second Circuit has never indicated that a resource available to all students cannot be considered for purposes of determining appropriate placement if that resource addressed a specific need of the child. In *Hardinson*, for instance, the Second Circuit deferred to the SRO's denial of tuition reimbursement not because the educational services highlighted by the plaintiffs were "generally available," but because the plaintiffs failed to provide the "necessary detail as to the services provided *or how they related to [the student's] educational progress*." 773 F.3d at 387 (emphasis added). Here, by contrast, Plaintiffs have pointed to testimony highlighting the specific impact of the iPad on W.E.'s educational progress. (*See* Case II Hr'g Tr. 381–83.) Moreover, the record indicates that W.E. "was the only student in

the school who was required to use [the iPad] for all classes," (John Doe Aff. ¶ 60), further

suggesting that the iPad was not a mere convenience or a generally available resource that W.E.

happened to take advantage of, but rather an educational benefit that was deployed for W.E.'s

specific advantage.[25]  The Court is not persuaded that the SRO's opinion, which failed to

consider this testimony at all, is entitled to deference on this point, and finds that the availability

of the iPad weighs in favor of reimbursement.

The SRO likewise provided no analysis on how the availability of a second study hall

impacted, or did not impact, the appropriateness of Northwood.  (*See* Case II SRO Op. 23–24.)

Because there is little evidence in the record of the additional study hall's benefit to W.E., (*see*

Case II Hr'g Tr. 441–42), the Court is not persuaded that the availability of a second study hall

weighs significantly in favor of Plaintiffs.  Still, the SRO's failure to even mention the additional

study hall period in reference to W.E.'s need to "complete[] assignments in a timely manner,

proofread[]/perfect[]/augment[] analysis rather than turn[] in a first draft, [and] turn[] in

---

[25] It may be argued that the Second Circuit's decision in *Gagliardo* suggests otherwise.
There, the Second Circuit held that "[a] unilateral private placement is only appropriate if it
provides 'education instruction *specifically* designed to meet the *unique* needs of a handicapped
child.'"  489 F.3d at 115 (quoting *Frank G.*, 459 F.3d at 365).  While the use of the word
"specifically" could be interpreted as precluding the reviewing court from considering generally
available accommodations, the word "specifically" is a typo—the Second Circuit was quoting its
earlier holding in *Frank G.*, which was in turn quoting the Supreme Court in *Rowley*.  In both
*Frank G.* and *Rowley*, the pertinent language is that educational instruction must be "*specially*
designed to meet the unique needs of a handicapped child."  *Frank G.*, 459 F.3d at 365
(emphasis added); *Rowley*, 458 U.S. at 188–89 (emphasis added).  Although later courts have
quoted the language from *Gagliardo*, the Court does not think that a typographical error should
control the disposition of this, or any other, case.  Even were that language controlling, however,
the Second Circuit in *Gagliardo* merely used that language to explain that improvements in a
student's performance attributable to the general advantages offered by private schools was
insufficient to establish that a nonpublic school was an appropriate placement.  *See* 489 F.3d at
115.  Such a holding does not run counter to the notion that generally available accommodations
may be considered where, as here, they address a specific and unique need of a handicapped
child.

homework on time," (Case II SRO Op. 24), gives the Court less confidence that the SRO

engaged this evidence in a meaningful way, *cf. R.E.*, 694 F.3d at 189 ("[T]he deference owed to

an SRO's decision depends on the quality of that opinion.").  Accordingly, although the

availability of a second study hall is not a significant factor, it does weigh slightly in favor of

reimbursement.

### *Counseling*

With respect to the counseling W.E. received, the Court agrees with the SRO that there is

no evidence that Northwood provided meaningful counseling.  Plaintiffs argue that the

"individualized counseling" that Mellor offered W.E. "on a regular, weekly basis, if not more

frequently," "proved extremely beneficial to [W.E.]."  (Pls.' Mem. 25.)  Plaintiffs stress the

informal approach that Mellor took to counseling, (*see id.*), and, indeed, the IHO found this

aspect of the counseling important, (*see* Case II IHO Op. 18 ("The informal counseling sessions

are specially designed to meet the [s]tudent's needs because previously he had not been eager to

take part in counseling.")).

Given that the SRO and the IHO disagree this time around, somewhat less deference to

the SRO's conclusion may be in order, *see A.A.*, 2015 WL 10793404, at *10; nevertheless, the

Court is still satisfied that the SRO's decision largely merits deference.  For one thing, the SRO

noted that, "[w]hile [W.E.] appear[ed] to have benefitted from the informal nature of his

interactions with [Mellor], the hearing record [was] devoid of information such as counseling

notes, progress reports toward goals, etc., showing how, if at all, these sessions addressed the

student's need to develop insight and coping skills."  (Case II SRO Op. 23.)  And, indeed,

evidence that a counseling routine successfully helps a student in one regard does not mean that

it necessarily is specially designed to meet that child's unique needs, even where the IHO found

that the private placement was appropriate.  *See Hardison*, 773 F.3d at 384, 387–88 (finding that notes indicating that the student was progressing psychologically "[did] not offer evidence of how the . . . program was 'specifically designed' to channel [the student's] psychological improvement into academic improvement").

Moreover, as the SRO noted, Dr. Williams "advocat[ed] that the supportive, informal counseling that was provided by one of [W.E.'s] teachers during the past academic year[] be supplemented by a more systematic psychotherapy program in the coming year," (*see* Case II Def.'s Ex. 17, at 2), but that there "[was] no evidence regarding if or how private counseling addressed the student's needs," (Case II SRO Op. 24).  It displays no defect in reasoning for the SRO to conclude that this observation cut against concluding that Northwood's counseling services were specially designed to meet W.E.'s needs.  *See M.H.*, 685 F.3d at 254 (characterizing "the fact that the parents [may have] obtained necessary services not offered through the selected school from an outside agency" as "an appropriate consideration, but . . . not necessarily dispositive").  Indeed, such a conclusion seems sound, particularly in light of the fact that, although the School "possessed very little information specific to [W.E.]" in advance of his freshman year when it accepted him, (John Doe Aff. ¶ 21), few if any changes to the accommodation plan were made in this respect except to adopt a more informal approach, (*see* Pls.' Mem. 25), despite ongoing contact with W.E. and his parents, and despite M.S. having contacted school officials about obtaining other psychological services, (*see* Case II Hr'g Tr. 627–28, 839–840).  The Court therefore concludes that the counseling W.E. received during his sophomore year does not support Plaintiffs' request for reimbursement.

*Nursing Services*

Next, Plaintiffs argue that "the 24-hour nursing support [was] essential for the control of [W.E.'s] migraines," and that "[t]he willingness of faculty members and both nurses to visit him and assist him during a migraine . . . highlight the individualized medical support." (Pls.' Mem. 25.) As above, the mere fact that the presence of a 24-hour nursing staff might be "the kind of educational and environmental advantage[] . . . that might be preferred by parents of any child, disabled or not," (Case II SRO Op. 24 (quoting *Gagliardo*, 489 F.3d at 115)), does not compel the conclusion that, in every case, a generally available accommodation cannot be probative of whether a nonpublic school is an appropriate placement. Here, W.E.'s migraines were a pervasive problem, and one that seemed intertwined with all of his other academic issues. It strains credulity to suggest that an around-the-clock nurse staff, one of whom resided on the same floor as W.E., (*see* John Doe Aff. ¶ 43), was not an educational feature that worked to W.E.'s specific benefit. And the mere fact that, during one of W.E.'s more severe migraines, the nursing staff considered sending W.E. back home to heal, (*see* Case II Pls.' Ex. T), offers no insight into the value W.E. derived from the presence of the nursing staff—there is no evidence that W.E. was actually sent home, and, if anything, this incident demonstrates that the nursing staff was both willing and able to offer W.E. medical attention when he needed it. On the other hand, the record is devoid of further evidence showing what specific benefits W.E. derived from the presence of the nursing staff. Accordingly, the Court concludes that this feature weighs only slightly in favor of reimbursement.

*Small Class Sizes*

Although Plaintiffs do so in the context of a section arguing that the School provided W.E. with appropriate therapeutic services, many of which have already been discussed herein,

Plaintiffs also press the point that Northwood was appropriate by virtue of its small class sizes. (*See* Pls.' Mem. 25–26; *see also* Pls.' Reply 7–9.)  Here, the SRO specifically noted that "the parties point[ed] to no authority" and that it had found none "that holds that small class size alone constitutes special education within the meaning of the IDEA."  (Case II SRO Op. 25 n.16.)  And, indeed, "small class sizes . . . [are] the kind of educational and environmental advantage[s] that might be preferred by parents of any child, disabled or not."  *Doe*, 790 F.3d at 452 (2d Cir. 2015) (alterations and internal quotation marks omitted); *see also C.L.*, 913 F. Supp. 2d at 37 ("[S]mall class size and enhanced access to teachers . . . 'are the kind of advantages that might be preferred by parents of any child, disabled or not.'" (quoting *M.H.*, 685 F.3d at 246)); *E.L.*, 2010 WL 1005165, at *9 (S.D.N.Y. Mar. 18, 2010) (characterizing "a structured environment [and] small class size" as "nothing more than 'educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not'" (quoting *Gagliardo*, 489 F.3d at 115)).  But while parents of a student might reasonably find small class sizes to be a generally beneficial feature of a school, that does not compel the conclusion that small class sizes cannot also be specially designed to meet the unique needs of a student.  That is especially true where, as here, the student's IEP specifically noted the importance of placing the student in a smaller class.  (*See* Case II Def.'s Ex. 18 (IEP), at 7 (recommending a student-teacher ratio of 8:1:1)).  *See also C.D. v. N.Y.C. Dep't of Educ.*, No. 15-CV-2177, 2016 WL 3453649, at *4, *18 (E.D.N.Y. June 20, 2016) (awarding tuition reimbursement partly because of testimony that the student "needed small class sizes and a small school," and the record indicated that the nonpublic school had "small class sizes featuring fewer than ten students"); *H.W. v. N.Y. State Educ. Dep't*, No. 13-CV-3873, 2015 WL 1509509, at *20 (E.D.N.Y. Mar. 31, 2015) (awarding tuition reimbursement partly because the record indicated

that the student needed one-on-one instruction if he was placed in larger classes, but the

nonpublic school offered smaller classes that obviated the need for one-on-one instruction).

In contrast to the SRO's opinion, the IHO addressed W.E.'s specific need for a smaller

class size, highlighting testimony from Dr. Rissenberg indicating that W.E. would benefit from a

smaller class that offered "an emotionally supportive environment and an appropriate intellectual

challenge."  (Case II IHO Op. 15 (internal quotation marks omitted).)  The IHO concluded that

"[t]his [was] precisely the type of classroom environment provided by [Northwood]."  (*Id.* at 16.)

Like the IHO, the Court is persuaded that while evidence of smaller class sizes is not, in every

case, prima facie evidence of appropriate placement, here, the smaller class sizes at Northwood

provided W.E. benefits specific to his unique needs, and thus this fact weighs in favor of

reimbursement.

After considering the strength of the SRO's opinion and the lack of attention given to

some of the most salient benefits offered by Northwood that targeted specific needs of W.E., the

Court concludes that, unlike its decision with respect to the 2011–2012, the SRO's decision with

respect to the 2012–2013 is not entitled to substantial deference.  There is no question the SRO

considered all of the evidence on the record, but its actual discussion of whether Northwood was

an appropriate placement was limited to mere repetition of the alleged failure of Northwood to

develop solutions to W.E.'s stress-related behavioral difficulties.  (*See* SRO Op. 23–25.)  This

conclusion overlooks many of the specific benefits Northwood provided to meet W.E.'s unique

needs, including its small class sizes, its boarding school aspect, and its 24-hour nursing

coverage, all of which had positive and direct effects on W.E.'s academic and social progress.

Moreover, the SRO's conclusion about Northwood's failure to address W.E.'s organizational and

stress-related needs is belied by the record, and the SRO provides no persuasive reasoning

otherwise.  The record indicates, for instance, that W.E.'s attendance record improved

dramatically during his time at Northwood, (*compare* Case I Joint Ex. 66 (7th grade attendance

summary), *and* Case I Joint Ex. 67 (8th grade attendance summary), *with* Case II Pls.' Ex. N

(sophomore year attendance summary)), and that it was W.E.'s stress-related symptoms that

caused his numerous absences in the seventh and eighth grades, (*see* Case I Hr'g Tr. 893–94,

923; Case II Hr'g Tr. 841–42; *see also* Case II Pls.' Ex. S (Williams Aff.)).  Furthermore, the

record indicates, and the SRO did not rebut or contradict, that W.E.'s organizational difficulties

were significantly aided by the use of the iPad, provided by Northwood, and by access to the

additional study hall period.  By contrast, the IHO, though not thorough and persuasive in all

respects, addressed each specific need of W.E. and identified how the features and

accommodations of Northwood met those needs.  (*See* Case II IHO Op. 14–19.)

Having considered the reasoning of both the SRO and the IHO, and having supplemented

their reasoning with its own review of the record, the Court concludes that Plaintiffs have met

their burden of showing that Northwood was an appropriate placement for the 2012–2013 school

year.  The Court reaches this conclusion, which differs from its conclusion regarding the 2011–

2012 school year, in part because the reasoning of the SRO with respect to the 2012–2013 school

year is conclusory and unpersuasive, and in part because the record with respect to the 2012–

2013 school year is more robust and offers more insight into the benefits and accommodations

Northwood offered to W.E. to meet his specific needs.

### iii.  Equitable Considerations

Even though the Court concludes that Northwood was an appropriate placement for W.E.

during the 2012–2013 school year, the Court may "reduce the amount of a reimbursement award

if the equities so warrant."  *Forest Grove*, 557 U.S. at 247.  "Courts fashioning discretionary

equitable relief under [the] IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." *Carter*, 510 U.S. at 16.  A court may thus discretionarily reduce the amount of reimbursement if, for instance, "the parents failed to give the school district adequate notice of their intent to enroll the child in private school." *Forest Grove*, 557 U.S. at 247.  A court may also be justified in denying reimbursement "where there is no indication the parents ever intended to return their child to a placement offered by the school district."  *J.S.*, 826 F. Supp. 2d at 675.

Because the SRO determined that Northwood was not an appropriate placement, it did not consider whether the equities favored reimbursement.  (*See* Case II SRO Op. 25.)  By contrast, the IHO, after finding that Northwood was an appropriate placement, considered the equities and concluded that it found "no basis under [the equities] to reduce or deny tuition reimbursement."  (Case II IHO Op. 20.)  Defendant urges the Court to give no deference to the IHO's opinion here because "the IHO made no findings of fact with regard to the equities, despite both parties making extensive arguments with regard to that issue."  (Def.'s Mem. 34.)  The Court agrees that the IHO opinion offers no analysis of the equities in this case, but the Court nevertheless concludes that, even upon de novo review, the equities favor reimbursement for the 2012–2013 school year.

Defendant's chief argument here is that Plaintiffs never intended to return W.E. to the public school system, and they point to the fact that Plaintiffs reenrolled W.E. at Northwood well before the CSE met in June 2012 to discuss W.E.'s IEP for the upcoming year.  (*See* Def.'s Mem. 34–35.)  The record indicates that W.E. was accepted for reenrollment at Northwood on February 29, 2012, with instructions to sign and return the enrollment contracts by March 30, 2012.  (*See* Case II Def.'s Ex. 33.)  Plaintiffs signed and returned the papers sometime in April

2012.  (*See* Case II Hr'g Tr. 1140.)  Defendant's argument here lacks common sense—had

Plaintiffs waited until June 2012 to reenroll W.E. in Northwood, they may very well have been

rebuffed for missing the reenrollment deadline by nearly three months.  The Court is not of the

opinion that parents of a student are required to forgo all educational opportunities while they

wait for the school district to convene a summer CSE meeting, and the law is not to the contrary.

*See N.Y.C. Dep't of Educ. v. V.S.*, No. 10-CV-5120, 2011 WL 3273922, at *15 (E.D.N.Y. July

29, 2011) (allowing reimbursement where the parent enrolled her child in a nonpublic school and

paid a largely nonrefundable deposit prior to the CSE meeting, reasoning that "it was entirely

reasonable for [the parent], while working cooperatively with the school district, to also preserve

her options by paying a partially refundable deposit to the [nonpublic school]"); *R.K. ex rel. R.K.

v. N.Y.C. Dep't of Educ.*, No. 09-CV-4478, 2011 WL 1131492, at *29–30 (E.D.N.Y. Jan. 21,

2011) ("[T]he Court rejects the [district's] contention that enrolling [the student in a private

school] prior to receiving the [notice of final recommendation] evidences bad faith . . . given the

DOE's delay in sending the [notice and final recommendation], the imminence of the new school

year[,] and [the parents'] need to preserve their legal rights."), *adopted by* 2011 WL 1131522

(E.D.N.Y. Mar. 28, 2011), *aff'd sub nom. R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir.

2012).  Moreover, "the purpose of the notice requirement is to give the district 'a meaningful

opportunity to minimize its expenses by developing its own IEP that would provide the child

with a FAPE within the [s]chool [d]istrict." *J.S.*, 826 F. Supp. 2d at 672 (quoting *W.M. v.

Lakeland Cent. Sch. Dist.*, 783 F. Supp. 2d 497, 504 (S.D.N.Y. 2011)).  There is no question here

that Defendant was on notice of W.E.'s placement in a private school that he had been attending

for the past year.  Defendant has not suggested, the record does not indicate, and the Court does

not find a reason to conclude that Defendant was unaware that Plaintiffs intended to reenroll

W.E. in Northwood again absent material changes in the District's IEP, or that the process for reenrollment started well before June 2012, when the CSE was eventually held.

Instead, the Court examines whether the record indicates that Plaintiffs participated in the CSE with an open mind and gave Defendant an opportunity to construct a plan that addressed W.E.'s needs.  There is no suggestion by Defendant that this was not the case, and the record does not provide any indication that Plaintiffs were disengaged from the CSE meetings or the development of the IEP.  For example, Plaintiffs visited the Southern Westchester BOCES Gifted Special Education in November 2011 and determined that it was a poor fit for W.E.  (*See* Case II Def.'s Ex. 35 (Dec. 2011 letter)).  When Defendant suggested enrolling W.E. in a similar program at Southern Westchester for the 2012–2013 school year, Plaintiffs, although already harboring reservations about the school's environment and plan for W.E., made another visit on July 20, 2012.  (*See* Case Hr'g Tr. 1071–73.)  Plaintiffs' willingness to revisit a program they already determined would unnecessarily isolate and stigmatize W.E. evinces a willingness to at least hear Defendant out, and undercuts Defendant's suggestion that W.E.'s reenrollment at Northwood was a predestined outcome.  Moreover, Plaintiffs offered substantive feedback about Defendant's proposed placement of W.E., providing detailed objections to the proposed placement at the Southern Westchester TSP Program, explaining their concern about the quality of the investigation being conducted by the CSE, and indicating that they were "interested in a *public* placement that meets [W.E.'s] needs, because . . . we would like to have him home, and there are financial considerations."  (Case II Def.'s Ex. 26, at 1 (emphasis added).)  Plaintiffs participated actively in the development of W.E.'s IEP, offered detailed feedback, and made clear their hope that W.E. would be able to return to public school.  As the IHO properly found, the record belies any suggestion that Plaintiffs acted in bad faith or did not provide Defendant a

meaningful opportunity to try and meet W.E.'s needs.  The Court therefore concludes that the equities favor reimbursement, and there are no grounds for reducing that award.

Accordingly, the Court grants Plaintiffs' Motion for Summary Judgment with respect to the 2012–2013 school year.

### 3.  Motion to Amend

As noted, Defendant also seeks to add a counterclaim for those costs awarded by the Case I IHO that the Case I SRO concluded the District did not appeal.  Defendant's Motion is granted in this respect.

Under Federal Rule of Civil Procedure 15(a)(2), once, as here, a party is not entitled to amend its pleading as a matter of course, it may "amend its pleading only with the opposing party's written consent or the court's leave," and a court is to "freely give [such] leave when justice so requires."  Whether to grant that leave is, however, ultimately "within the sound discretion of the district court."  *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009) (internal quotation marks omitted); *see also Cat3, LLC v. Black Lineage, Inc.*, No. 14-CV-5511, 2015 WL 5559569, at *2 (S.D.N.Y. Sept. 21, 2015) ("Notwithstanding the liberality of the general rule, 'it is within the sound discretion of the court whether to grant leave to amend' . . . . " (quoting *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994))).  Although "outright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion," it is well established that among the "good reason[s]" for a district court to deny leave to amend are "futility, bad faith, undue delay, or undue prejudice to the opposing party," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200–01 (2d Cir. 2007) (alterations and internal quotation marks omitted) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Here, Plaintiffs argue that "[t]he Court should deny the District's motion for leave to amend as its

effort is futile because the District seeks to assert for the first time a challenge to the SRO's decision outside of the statute of limitations." (Pls.' Mem. 31.) The Court begins by considering whether Plaintiffs are correct that Defendant's proposed challenge is untimely before, if necessary, considering whether any other reason might counsel against amendment.

a.  Is the Proposed Amendment Futile?

As a general proposition, "[p]roposed amendments are futile if they would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) . . . [;] [t]hus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (internal quotation marks omitted); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."); *LP Funding, LLC v. Tantech Holdings, Ltd.*, No. 15-CV-4081, 2016 WL 1706182, at *2 (S.D.N.Y. Apr. 27, 2016) ("In addressing the proposed futility of an amendment, the proper inquiry is comparable to that required upon a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." (internal quotation marks omitted)). Nevertheless, there is also authority providing that courts are to consider the futility of an amended complaint under the summary judgment standard when proceedings have reached a sufficiently late stage in the case. *See Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (noting that "[a] court may deny [leave to amend] as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law under Fed. R. Civ. P. 56(c)," where a "cross-motion is made in response to a Fed. R. Civ. P. 56 motion for summary judgment, and the parties have fully briefed the issue whether the

proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions"); *Merrick Bank Corp. v. Chartis Specialty Ins. Co.*, No. 12-CV-7315, 2015 WL 4126780, at *1 (S.D.N.Y. July 7, 2015) ("Although an assertion of futility is normally assessed under the standard for a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), where the motion to amend is made at a late stage and the [c]ourt has the full evidentiary record at its disposal, a summary judgment standard will be applied." (internal quotation marks omitted)); *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 404 (S.D.N.Y. 2014) ("Ordinarily, leave to amend may be denied on the basis of futility if the proposed claim would not withstand a Rule 12(b)(6) motion to dismiss.  However, when the motion to amend is filed after the close of discovery and the relevant evidence is before the court, a summary judgment standard will be applied instead." (citation omitted)).  Under either standard, of course, a claim would run into trouble if, as is suggested here, it is barred by the applicable statute of limitations.  However, that is not the case here.  The Court will first look to the statutory text and where the Parties clash in their interpretations of it.

Under the IDEA, where an aggrieved party wishes to bring a civil action in federal court, he or she "ha[s] 90 days from the date of the decision of the hearing officer to bring such an action, or, if the State has an explicit time limitation for bringing such action under th[e] subchapter, in such time as the State law allows."  20 U.S.C. § 1415(i)(2)(B).  New York law has, in fact, weighed in on the issue, and, under N.Y. Educ. Law § 4404(3)(a), a proceeding seeking review of an SRO's decision "shall be commenced within four months after the determination to be reviewed becomes final and binding on the parties."  Because the SRO issued his decision in Case I on January 31, 2014, (*see* Case I SRO Op. 32), the Parties agree that

each side had until May 31, 2014 to appeal the decision, (*see* Def.'s Mem. 7; Pls.' Mem. 31).

Where they disagree, however, is over the import of the fact that Defendant has not yet filed a

counterclaim and, instead, seeks to do so now through amendment of its answer.

According to Defendant, "[s]ince it is beyond dispute that New York's four-month

limitations period applies to the commencement of this action, New York CPLR § 203(d) will

govern the timelines of any counterclaim the District may assert." (Def.'s Mem. 7.) Plaintiffs,

however, take the position that, "when the District filed [its] Answer on June 18, 2014, although

outside the statutory period, [it] could have invoked CPLR § 203(d) to argue that [its] challenge

was timely for any counterclaim asserted within [its] answer," but that, because "the

Answer . . . does not contain a counterclaim or even a single allegation," "any challenge from the

District to the SRO decision falls outside the statute of limitations," and the proposed

amendment does not relate back to the original answer. (Pls.' Mem. 32.) Put differently, the

Parties agree that Defendant's counterclaim is untimely, but they disagree as to whether

Defendant may use CPLR § 203(d) to resuscitate that counterclaim.

As it turns out, the Parties' shared premise is incorrect, because, even if something else

does, the statute of limitations does not bar Defendant's proposed amendment. As noted, the

applicable IDEA statute of limitations governs when a prospective litigant may "bring . . . an

*action*." 20 U.S.C. § 1415(i)(2)(B) (emphasis added). Construing this language, the Third

Circuit and several district courts outside that circuit have found that the applicable language

does not impose a time bar to at least compulsory counterclaims brought under the IDEA. *See*

*Jonathan H. v. Souderton Area Sch. Dist.*, 562 F.3d 527, 530 (3d Cir. 2009) (holding that

"[§] 1415(i)(2)(B) limits a party's right to 'bring an action' to within 90 days after the final

administrative decision," and concluding "the plain language of the statutory text does not limit a

party's right to pursue a counterclaim because the assertion of a counterclaim is not 'bringing an

action'" (alteration omitted));[26] *Doe v. Reg'l Sch. Unit No. 21*, No. 11-CV-25, 2011 WL

2160935, at *3 (D. Me. June 1, 2011) (adopting as persuasive the reasoning of the Third and

Fifth Circuits in *Jonathan H.* and *Ruben A.*); *D.B. ex rel. Elizabeth B. v. Sutton Sch. Dist.*, No.

10-CV-10897, 2011 WL 475064, at *4 (D. Mass. Feb. 3, 2011) (agreeing with "the Third

Circuit's analysis of the text of § 1415 [in *Jonathan H.*], as well as its observations about the

equities of the rule," and concluding that, "[a]ccordingly, [the] defendants' counterclaim is not

subject to the 90-day statute of limitations, and may be asserted after that period has elapsed");

*cf. also Bd. of Educ. of Cty. of Boone v. K.M.*, No. 14-CV-10563, 2015 WL 1481775, at *4

(S.D.W. Va. Mar. 31, 2015) (citing *Ruben A.* and *Jonathan H.* for the proposition that

"[c]ounterclaims may be asserted when a party brings an IDEA action in federal court").[27]  This

is a sensible rule: "If counterclaims were prohibited in this context, parties would file 'protective

complaints' to preserve issues adjudicated against them, even when they otherwise would

countenance the administrative judgment, for fear that their adversaries would file complaints

just before the statute of limitations expired . . . ."  *Jonathan H.*, 562 F.3d at 530.  "This would

cause unnecessary litigation."  *Id.*

---

[26] The Fifth Circuit, in a summary order, has adopted the Third Circuit's view on this issue.  *See Ruben A. v. El Paso Indep. Sch. Dist.*, 414 F. App'x 704, 707 (5th Cir. 2011) (noting that the relevant IDEA provision "specifically applies to 'the party bringing the action' and neither expressly nor impliedly limits the filing of counterclaims in response to civil actions brought in federal court," and concluding that, "[a]s a result, the district court erred in dismissing [the school district's] counterclaim as time-barred" (alteration omitted) (quoting 20 U.S.C. § 1415(i)(2)(B)).

[27] Whether this rule applies only to compulsory counterclaims or permissive ones too does not matter.  Defendant's proposed answer contemplates a compulsory counterclaim as it arises out of the same transaction or occurrence that is the subject matter of the Parents' complaint without requiring adding another party over whom the Court cannot acquire jurisdiction.  *See* Fed. R. Civ. P. 13(a)(1).

With these principles in mind, the inapplicability of CPLR § 203(d) is clear.  That provision, in its entirety, reads:

> A defense or counterclaim is interposed when a pleading containing it is served.  A defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed, except that if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed.

§ 203(d) therefore intimates a proposed counterclaim's untimeliness only if it does not arise out of the same "transactions, occurrences, or series of transactions or occurrences" and if it was untimely at the time the claims in the complaint were interposed.  Because its relevance therefore stands or falls with the proposition that the counterclaim was untimely, absent some basis to conclude that to be so, § 203(d) is inapposite.

One conceptual wrinkle deserves passing acknowledgment.  As noted, § 1415(i)(2)(B) provides that an aggrieved party "shall have 90 days from the date of the decision of the hearing officer to bring . . . an action, or, *if the State has an explicit time limitation for bringing such action under this subchapter, in such time as the State law allows*."  (emphasis added).  In both *Ruben A.* and *Jonathan H.*, the courts applied the default 90-day provision found in the IDEA statute rather than a specialized state law provision.  *See Ruben A.*, 414 F. App'x at 706 (noting that "[t]he IDEA authorizes a party aggrieved by an administrative due process hearing to bring a civil action in federal court, but 'the party bringing the action shall have 90 days from the date of the decision of the hearing officer to bring such an action . . . .'" (alteration omitted) (citing 20 U.S.C. §§ 1415(i)(2)(A), (B))); *Jonathan H.*, 562 F.3d at 528 (noting that "the [d]istrict [c]ourt affirmed the administrative decision in all respects and denied [the school district's] counterclaim as untimely because it was not brought within 90 days of the final administrative

decision"), whereas here, there is a relevant state statute on point, *see* N.Y. Educ. Law
§ 4404(3)(a).  In keeping with Defendant's assertion (albeit one not followed by any sort of
citation) that, "[s]ince it is beyond dispute that New York's four-month limitations period applies
to the commencement of this action, New York CPLR § 203(d) will govern the timelines [sic] of
any counterclaim the District may assert," (Def.'s Mem. 7), the case could be made that § 203(d)
is the "explicit time limitation," § 1415(i)(2)(B), for IDEA counterclaims.  The Court does not
think that is so for several reasons.  First, there is little if any reason to think that a state-created
"explicit time limitation" within the meaning of the IDEA statute of limitations provision is to be
found in a generalized "recoupment" provision like § 203(d).  Moreover, it is instructive that in
*Doe v. Regional School Unit No. 21*, the District of Maine found *Jonathan H.* and *Ruben A.*
"persuasive" and ready to apply, despite the fact that Maine regulations provided a statute of
limitations separate and apart from the IDEA provision (albeit of the same length), *see* 2011 WL
2160935, at *2, and even though Maine had a statute not unlike § 203(d), *see* Me. Stat. tit. 14,
§ 865 ("All the provisions hereof respecting limitations apply to any counterclaim by the
defendant except a counterclaim arising out of the transaction or occurrence that is the subject
matter of the plaintiff's claim to the extent of the demand in the plaintiff's claim.  The time of
such limitation shall be computed as if an action had been commenced therefor at the time the
plaintiff's action was commenced."), which, in any event, another Maine district court found
inapposite in the IDEA context, *see Mr. & Mrs. R. v. Me. Sch. Admin. Dist. No. 35*, No. 00-CV-
367, 2001 WL 166358, at *3 (D. Me. Feb. 20, 2001) (report and recommendation) (observing
that "[t]he parties devote considerable time and effort to arguments based on a state statute, 14
M.R.S.A. § 865," but concluding that "it is not necessary to reach this issue in order to rule on
the pending motion").  Finally, the IDEA did not always contain the 90-day limitation found in

§ 1415(i)(2)(B).  *See* Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647, 2724 (adding current § 1415(i)(2)(B)).  To the extent Congress saw the need to speak with greater clarity to express when an aggrieved party could institute a civil action, it would be odd indeed if, through a coy silence, it also instructed federal courts to rummage around in states' laws for a time limit to apply to IDEA counterclaims.

### b.  May Defendant Amend its Answer?

With that in mind, the question of § 203(d)'s import gives way to the relatively prosaic issue of whether Defendant may amend its Answer to add a new counterclaim.  Despite the late stage in this case, amendment is appropriate, and the Court therefore grants Defendant leave to assert its counterclaim.

Until December 1, 2009, the Federal Rules of Civil Procedure had a provision apart from Rule 15(a) that dealt with the issue of omitted counterclaims.  Prior to that date, Rule 13(f) provided that "[t]he court may permit a party to amend a pleading to add a counterclaim if it was omitted through oversight, inadvertence, or excusable neglect or if justice so requires."  Fed. R. Civ. P. 13(f) (repealed 2009).  That rule engendered some confusion and so was shelved, with the Advisory Committee explaining in its notes that "Rule 13(f) is deleted as largely redundant and potentially misleading," and, instead, "[a]n amendment to add a counterclaim will be governed by Rule 15."  Fed. R. Civ. P. 13 advisory committee's note to 2009 amendment.  For statute of limitations purposes, "[d]eletion of Rule 13(f) ensures that relation back is governed by the tests that apply to all other pleading amendments."  *Id.*  In other words, Defendant's motion is a run-of-the-mill amendment request.

Using as a guidepost those grounds upon which the Supreme Court and Second Circuit have made clear that leave to amend can rightly be denied—specifically, futility, bad faith,

undue delay, or undue prejudice to the opposing party, *see McCarthy*, 482 F.3d at 200 (citing *Foman*, 371 U.S. at 182)—the Court sees no reason to withhold its consent, particularly in light of Rule 15(a)(2)'s "permissive standard" and the Second Circuit's "strong preference for resolving disputes on the merits," *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (internal quotation marks omitted).  First, with respect to futility, for the reasons already discussed, Plaintiffs' argument falls flat, and, absent some other, more availing futility argument, the Court sees no reason to deny the relief on such grounds.  *Cf. LP Funding, LLC v. Tantech Holdings, Ltd.*, No. 15-CV-4081, 2016 WL 1706182, at *2 (S.D.N.Y. Apr. 27, 2016) ("As the party opposing amendment, [the] [p]laintiff bears the burden of establishing that an amendment would be futile." (internal quotation marks omitted)).  Second, there is no bad faith on Defendant's part—nor do Plaintiffs argue otherwise.  Third, with respect to undue delay, although it is hardly a good fact for Defendant that summary judgment motions were filed with or before its motion to amend, *cf. State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (reversing district court's denial of the plaintiffs' motion to amend and noting that, "[a]t the time [the] plaintiffs requested leave to amend, no trial date had been set by the court and no motion for summary judgment had yet been filed by the defendants" (citation omitted)), it is also true that "[m]ere delay . . . , absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend," *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008).  And, lastly, amendment would not lead to the sort of undue prejudice sufficient to overcome Rule 15(a)'s liberality: Courts in the Second Circuit have recognized that, "in order to determine whether an amendment prejudices a non-moving party," it is generally appropriate to "consider whether the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and

prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff

from bringing a timely action in another jurisdiction." *Portelos v. City of New York*, No. 12-CV-

3141, 2015 WL 5475494, at *2 (E.D.N.Y. Sept. 15, 2015) (internal quotation marks omitted).

Here, the proposed amendment relates to a straightforward question of law rather than a fact-

intensive issue that would require discovery.  Further, while there may be some delay inherent in

any amendment of an Answer to include a new counterclaim, given the high threshold to deny

leave to amend on the grounds of delay (as discussed above), it does not appear that any delay is

significantly prejudicial to merit denying leave to amend.  Moreover, if Defendant prevails on its

proposed counterclaim, thereby permanently depriving Plaintiffs of the sum of money at issue,

Plaintiffs' ability to obtain relief elsewhere will have been foreclosed by a binding adjudication

on the merits, not the timing of Defendant's amendment.  *Cf. Monahan v. N.Y.C. Dep't of Corr.*,

214 F.3d 275, 284 (2d Cir. 2000).  At bottom, "[i]t is *undue* prejudice, not prejudice itself, that

justifies a denial of leave to amend," *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12-CV-

6608, 2014 WL 113728, at *3 (S.D.N.Y. Jan. 13, 2014), and where, as here, a defendant has a

potentially meritorious basis to seek reimbursement for funds it believes it was wrongfully

forced to pay to a plaintiff, allowing even a belated counterclaim for reimbursement is not the

sort of prejudice that overcomes Rule 15(a)'s liberality, *see Woodard v. N.Y. Health & Hosps.

Corp.*, 554 F. Supp. 2d 329, 347, 351 (E.D.N.Y. 2008) (granting the defendant's motion for

leave to amend its answer to add a counterclaim to recoup money the defendant claimed the

plaintiff owed it under the agreement at issue, even though the motion to amend was filed at the

same time as the motion for summary judgment), *aff'd in part, remanded in part*, 350 F. App'x

586 (2d Cir. 2009).[28]  Therefore, Defendant is permitted to amend its answer to add its proposed

counterclaim.

Before closing, one final word is in order: In Plaintiffs' Notice of Motion, they purport to

seek relief pursuant to Federal Rule of Civil Procedure 54 for the same expenses at issue in

Defendant's proposed Motion to Amend.  (*See* Am. Notice of Cross-Mot. ¶ 2 (Dkt. No. 37).)

Plaintiffs' omission of any briefing on this point from their memorandum of law, coupled with

their purported incorporation by reference to two other letters on the docket, (*see id.*), seems a

questionable maneuver in light of the page limitation set in the scheduling order, (*see* Dkt. No.

10).  Nevertheless, it is significant that, in their first letter, Plaintiffs expressly press the point that

the Court should take up the question because there is "no unresolved question of law . . . with

respect to the finality of the determination finding District obligated to reimburse certain past

costs for counseling and evaluation."  (*See* Letter from William A. Walsh, Esq., to Court (Jan.

23, 2015) 2 (Dkt. No. 13).)  However, in light of the Court's ruling on Defendant's Motion to

Amend, that premise is no longer accurate, and the Court denies Plaintiffs' requested Rule 54

relief without prejudice as premature.

---

[28] The Second Circuit explicitly noted that the district court in *Woodward* "properly permitted [the defendant] to amend its answer to file a counterclaim against [the plaintiff]." *Woodard*, 350 F. App'x at 588.

### III. Conclusion

For the foregoing reasons, the Court grants Defendant's Motion in part and denies it in part, and grants Plaintiffs' Motion in part and denies it in part. Plaintiffs' Motion is granted with respect to the tuition reimbursement sought for the 2012–2013 school year. Defendant's Motion is granted in all other respects. The Clerk of the Court is respectfully requested to terminate the pending Motions. (See Dkt. Nos. 32, 37.) Defendant is to file its Amended Answer within two weeks of the date of this Opinion. The Court will hold a conference on December 16, 2016, at 3:00 PM.

SO ORDERED.

Dated:      November 23, 2016
             White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE